908 F.2d 1155
 12 Employee Benefits Ca 2449
 Robert HOZIER, Ralph Kohart, Peter A. White, Marc Duning and
David Carroll, Appellants,
v.
MIDWEST FASTENERS, INC., KSM Fastening Systems, Inc. t/a
Erico Fastening Systems, Inc. and Erico
International Corporation.
 No. 89-5551.
 United States Court of Appeals,
Third Circuit.
 Argued Nov. 30, 1989.
Decided July 24, 1990.
 
 James Katz (argued), Mark Belland, Tomar, Simonoff, Adourian & O'Brien, Haddonfield, N.J., for appellants.
 Steven W. Suflas (argued), Archer & Greiner, P.C., Haddonfield, N.J., for appellees.
 Before BECKER and STAPLETON, Circuit Judges, and KELLY, District Judge.*
 OPINION OF THE COURT
 BECKER, Circuit Judge.
 
 
 1
 Plaintiffs appeal from a grant of summary judgment to the defendant corporations, which formerly employed the plaintiffs and which declined to make certain severance payments to plaintiffs when they were involuntarily terminated. Plaintiffs contend that they are entitled to those payments under the terms of an ERISA welfare plan defendants had created in 1985. Defendants respond that the 1985 plan was amended in 1987, before plaintiffs' termination, and that plaintiffs received all the benefits to which they were entitled under the amended, less generous plan.
 
 
 2
 Plaintiffs contend that defendants, by unilaterally amending their severance plan in order to deny plaintiffs the additional benefits, violated fiduciary duties imposed on them by ERISA. We agree with defendants that they were not acting in their capacity as an ERISA fiduciary when they sought to promulgate the amendment, and that the amendment therefore cannot be struck down on that basis. However, we agree with the plaintiffs' contention that ERISA precludes oral modification of employee benefit plans. Because defendants concede that the purported 1987 amendment was never reduced to a writing before plaintiffs were terminated, we conclude as a matter of law that the unamended 1985 plan must govern plaintiffs' claims for severance benefits.
 
 
 3
 Plaintiffs contend that in evaluating their entitlement to benefits under the 1985 plan, the trier of fact must consider not only the terms of that plan, but also the defendants' failure to comply with ERISA's reporting and disclosure provisions. We reject this contention. However, we conclude that the terms of the plan, considered in light of other record evidence bearing on the proper construction of those terms, are sufficiently ambiguous that a reasonable trier of fact could find that plaintiffs are entitled to benefits. Accordingly, we will reverse and remand for a trial on that issue.
 
 I. BACKGROUND
 
 4
 The following facts are essentially undisputed. Prior to July 1985, defendant Erico International Corporation ("EIC") was involved in the stud welding industry through the Erico-Jones Company, a wholly owned subsidiary of EIC. On July 15, 1985, EIC purchased KSM Fastening Systems, Inc. ("KSM"), a competitor of Erico-Jones. EIC then began to consolidate the various operations of Erico-Jones and KSM, eliminating unnecessarily duplicative positions within those companies. Ultimately, EIC planned to merge Erico-Jones and KSM into Erico Fastening Systems, Inc. ("EFS"), a new subsidiary it had created for that purpose.
 
 
 5
 EIC set up an executive committee to oversee the consolidation. The committee determined to make severance payments to employees laid off as a result of the consolidation, and it developed a formula for calculating those benefits. A six-page document explaining the severance policy was circulated to a select group of EIC's high-level managers. The first page of the document was a memo entitled "Severance Pay Erico Jones-KSM Merger," which was written by Sandra Claflin, Erico-Jones's personnel manager. It states that "[t]he attached severance package ... is to be used for the lay-off of [employees] for the merger of Erico Jones and KSM" and that the package "cancels out any other severance policy for the time frame involved in adjustment of workload and responsibilities that is involved in this merger."
 
 
 6
 The "package" consisted of three attachments: (1) a table setting out amount of severance pay as an increasing function of the affected employee's age and years of service; (2) a list of various details of the policy (none of which is relevant here); and (3) an outline of a three-page letter drawn up "for the merger" to be given to each covered employee. The letter informs the employee of his impending termination and the amount of his particular severance payment. A copy of the table was again distributed to a select group of executives on August 29, 1986. Attached was a cover letter written on EFS stationery by Annmarie Horan, personnel director first of KSM and later EFS, which described the table as "a copy of EFS' severance pay guidelines."
 
 
 7
 The consolidation of the respective operations of Erico-Jones and KSM began during late 1985 and continued into 1986. Employees laid off as a result were given severance benefits pursuant to the 1985 package. Details of the package were never disclosed to the employees. The formal merger of Erico-Jones and KSM into EFS did not occur until December 11, 1987.
 
 
 8
 On December 1, 1986, a group of EIC executives including Richard Craven undertook a leveraged buyout of EIC. As part of the same transaction, these executives caused EIC to sell Erico-Jones, KSM, and EFS to defendant Midwest Fasteners, Inc. ("Midwest"), a corporation wholly owned by one E.B. Neff. Neff installed Thomas Hartmann to run Midwest and its new subsidiaries. Under Neff and Hartmann, Midwest provided severance benefits on a case-by-case basis. Hartmann authorized severance benefits consistent with the terms of the 1985 plan for at least nine employees laid off during his tenure, including one employee terminated as late as May 1987. During the period of Neff's control, Midwest lost some $2 million.
 
 
 9
 On July 10, 1987, Midwest defaulted on certain of its obligations to EIC. As a result, EIC gained control of Midwest, ousted Neff and Hartmann, and immediately installed Craven as General Manager of Midwest. Soon thereafter, Craven unilaterally instituted a policy under which employees terminated by Midwest would be eligible for only two weeks of severance pay, regardless of their age or years of service. The new policy was implemented immediately, but was never reduced to a writing. Craven also sought to reduce Midwest's sales expenses.
 
 
 10
 Plaintiffs are five former sales employees who were terminated, effective July 31, 1987, in the layoffs that ensued. Pursuant to Craven's severance policy, plaintiffs each received two weeks of severance pay. Had their payment been calculated under the terms of the 1985 package, each plaintiff would have received a far more generous payment.
 
 
 11
 Plaintiffs filed a three-count complaint against Midwest and EIC to recover the additional benefits. Count one charged that defendants, in unilaterally amending or terminating the 1985 severance package, violated fiduciary duties imposed on them by ERISA. Count two sought a declaratory judgment that plaintiffs are entitled to benefits because of defendants' violations of ERISA's reporting and disclosure provisions. Count three sought benefits under the terms of the 1985 severance plan. The parties filed cross motions for summary judgment. The district court denied plaintiffs' motion, granted defendants' motion on all counts, and entered judgment for defendants. This appeal followed.[1]
 
 
 12
 Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). Asserted disputes of fact are "material" if their resolution could affect the outcome of the case under the applicable substantive law, and are "genuine" if the evidence bearing on the disputed fact is such that a reasonable jury could find for the nonmoving party. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). Our scope of review is plenary. See, e.g., Erie Telecommunications, Inc. v. City of Erie, 853 F.2d 1084, 1093 (3d Cir.1988).
 
 
 13
 For ease of exposition, we shall address count one of the complaint first, then count three, then count two.
 
 II. BREACH OF FIDUCIARY DUTY
 
 14
 Count one alleges the breach of fiduciary duties imposed by ERISA. Plaintiffs locate that breach in Craven's decision to amend the terms of the 1985 severance plan, because Craven allegedly failed to administer the plan in accordance with its terms. A proper analysis of this argument must begin with ERISA's statutory scheme regarding fiduciaries and their duties.
 
 
 15
 Fiduciary duties under ERISA attach not just to particular persons, but to particular persons performing particular functions. Thus, when employers themselves serve as plan administrators, " 'they assume fiduciary status "only when and to the extent" that they function in their capacity as plan administrators, not when they conduct business that is not regulated by ERISA.' " Payonk v. HMW Industries, Inc., 883 F.2d 221, 225 (Garth, J., announcing the judgment of the court) (citation omitted); see also id. at 231 (Stapleton, J., concurring in the judgment) ("Under ERISA the roles of plan administrator and plan sponsor are distinct. The plan administrator owes a fiduciary duty to the plan participants; the plan sponsor, as long as it is not acting as an administrator, generally does not.").
 
 
 16
 Section 3(21)(A) of ERISA defines when a person acts in a fiduciary capacity. In pertinent part, it provides:
 
 
 17
 [A] person is a fiduciary with respect to a plan to the extent (i) he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets, (ii) he renders investment advice for a fee or other compensation, direct or indirect, with respect to any moneys or other property of such plan, or has any authority or responsibility to do so, or (iii) he has any discretionary authority or discretionary responsibility in the administration of such plan.
 
 
 18
 29 U.S.C. Sec. 1002(21)(A) (1982). Because the severance plan at issue in this case was unfunded, there is no question regarding the management or investment of a separate trust. There is also no question that Craven, acting on behalf of Midwest, was an "administrator" with "discretionary authority" over the plan.[2] Thus, the precise issue we must consider is whether Craven's decision to amend the terms of the 1985 severance plan constituted a decision regarding the "administration" of a plan within the meaning of section 3(21)(A)(iii) of ERISA. If not, Craven was acting in his capacity as a Midwest executive, not as a plan administrator, and as such was unconstrained by ERISA's fiduciary requirements.[3]
 
 
 19
 If a decision to amend a plan were a decision about plan administration, then it would be governed by section 404 of ERISA, 29 U.S.C. Sec. 1104, which requires an undivided duty of loyalty to covered employees. "[A] fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries ... for the exclusive purpose of ... providing benefits to participants and their beneficiaries...." Id. Sec. 1104(a)(1)(A)(i).[4] Thus, if an employer's decision whether or not to amend a benefit plan constituted a decision about plan "administration," then it would have to be made solely with the interests of the covered employees in mind. Under that standard, it is virtually impossible to see how a decision to terminate or cut back benefits could pass muster, absent some calamitous circumstance like the imminent insolvency of the employer. Thus, under plaintiffs' reading of ERISA, although nothing in the statute requires the creation of employee benefit plans in the first place, the fiduciary duty provisions in effect require that benefits, once created, cannot ordinarily be narrowed or eliminated by later amendment.[5] We believe that this result is patently inconsistent with ERISA's language, structure, and legislative history.
 
 
 20
 ERISA's participation and vesting requirements, ERISA Secs. 201-211, 29 U.S.C. Secs. 1051-1061, squarely address the problem of how much to limit an employer's power to withdraw previously offered benefits. As to pension plans, ERISA provides detailed minimum requirements regarding how benefits must accrue through time, see id. Sec. 204, 29 U.S.C.A. Sec. 1054 (1990 Supp.) (as amended), and how accrued benefits must become vested--i.e. nonforfeitable, see id. Sec. 203, 29 U.S.C.A. Sec. 1053 (1990 Supp.) (as amended). More particularly, it significantly restricts how plan amendments may alter vesting schedules. See id. Sec. 203(c), 29 U.S.C.A. Sec. 1053(c) (1990 Supp.) (as amended). None of these provisions applies to welfare plans, however, which are exempted from all of ERISA's participation and vesting requirements. See id. Sec. 201(1), 29 U.S.C. Sec. 1051(1) (1982).
 
 
 21
 Congress plainly did not impose as stringent vesting requirements as it might have. We can hardly attribute that decision to oversight, however. Having made a fundamental decision not to require employers to provide any benefit plans, Congress was forced to balance its desire to regulate extant plans more extensively against the danger that increased regulation would deter employers from creating such plans in the first place. In other words, although ERISA was clearly "designed to promote the interests of employees and their beneficiaries in employee benefit plans," Shaw v. Delta Air Lines, Inc., 463 U.S. 85, 90, 103 S.Ct. 2890, 2896, 77 L.Ed.2d 490 (1983), the statute was also designed to "minimize[ ]" the "adverse impact" of "cost increases" imposed on employers by the tougher regulation, H.Rep. No. 533, 93rd Cong., 1st Sess. 1, reprinted in 1974 U.S.Code Cong. & Admin. News 4639, 4639. Thus, Congress analyzed "all of the provisions in [ERISA] ... on the basis of their projected costs in relation to the anticipated benefit to the employee participant." Id., 1974 U.S.Code Cong. & Admin.News at 4639-40.
 
 
 22
 Congress's concern with minimizing employers' compliance costs is especially evident in ERISA's accrual and vesting provisions. Before determining appropriate minimum vesting requirements for pension plans, the Senate Subcommittee on Labor commissioned an independent actuarial study "to determine the range of estimated costs to private pension plans resulting from compliance with minimum vesting requirements under several proposed minimum vesting standards." D. Grubbs, Summary of Report: Study of the Cost of Mandatory Vesting Provisions (1972), reprinted in 1974 U.S.Code Cong. & Admin.News 4884, 4885. Moreover, Congress imposed no vesting requirements on welfare plans because it determined that "[t]o require the vesting of these ancillary benefits would seriously complicate the administration and increase the cost of plans whose primary function is to provide retirement income." H.Rep. No. 807, 93rd Cong., 2d Sess. 60, reprinted in 1974 U.S.Code Cong. & Admin. News 4670, 4726; S.Rep. No. 383, 93rd Cong., 1st Sess. 51, reprinted in 1974 U.S.Code Cong. & Admin.News 4890, 4935.
 
 
 23
 In light of this background, we find it extremely unlikely that Congress, in defining an ERISA fiduciary in section 3(21)(A), intended that the word "administration" encompass amendment decisions, thus sweeping away by indirection the limitations so meticulously built into the participation and vesting requirements.
 
 
 24
 Virtually every circuit has rejected the proposition that ERISA's fiduciary duties attach to an employer's decision whether or not to amend an employee benefit plan. For example, in Sutton v. Weirton Steel Division, 724 F.2d 406 (4th Cir.1983), cert. denied, 467 U.S. 1205, 104 S.Ct. 2387, 81 L.Ed.2d 345 (1984), the Fourth Circuit held that an employer's decision "to renegotiate or amend ... unfunded contingent benefits" was "not to be reviewed by fiduciary standards." Id. at 411. Similarly, the Eleventh Circuit has held that "ERISA simply does not prohibit a company from eliminating previously offered benefits that are neither vested nor accrued." Phillips v. Amoco Oil Co., 799 F.2d 1464, 1471 (11th Cir.1986), cert. denied, 481 U.S. 1016, 107 S.Ct. 1893, 95 L.Ed.2d 500 (1987). See also, e.g., Musto v. American General Corp., 861 F.2d 897, 912 (6th Cir.1988) ("[W]hen an employer decides to establish, amend, or terminate a benefits plan, as opposed to managing any assets of the plan and administering the plan in accordance with its terms, its actions are not to be judged by fiduciary standards."), cert. denied, --- U.S. ----, 109 S.Ct. 1745, 104 L.Ed.2d 182 (1989); Young v. Standard Oil (Indiana), 849 F.2d 1039, 1045 (7th Cir.1988) ("In short, an employer does not owe its employees a fiduciary duty when it amends or abolishes a severance benefit plan."), cert. denied, 488 U.S. 981, 109 S.Ct. 529, 102 L.Ed.2d 561 (1989); Anderson v. John Morrell & Co., 830 F.2d 872, 876 (8th Cir.1987) ("[T]he terms of ERISA do not provide a cause of action against the Company for unilaterally eliminating the policy."); Cunha v. Ward Foods, Inc., 804 F.2d 1418, 1432-33 (9th Cir.1986) ("[The employer] was not acting in connection with its fiduciary responsibilities as Plan administrator, but instead, was acting in its corporate capacity. The decision to terminate the Plan was a business decision that properly rested with [the employer's] corporate offices."); Amato v. Western Union International, Inc., 773 F.2d 1402, 1417 (2d Cir.1985) ("[The] officers acted on behalf of a corporate employer and not as Plan fiduciaries in amending its pension plan."), cert. dismissed, 474 U.S. 1113, 106 S.Ct. 1167, 89 L.Ed.2d 288 (1986). We know of no decision by any court of appeals to the contrary.
 
 
 25
 Our own cases have suggested as much. In Viggiano v. Shenango China Division, 750 F.2d 276 (3d Cir.1984), we stated that "ERISA does not require an employer to establish a [plan] nor continue it indefinitely." Id. at 279 (emphasis added). Moreover, in Payonk v. HMW Industries, Inc., 883 F.2d 221 (3d Cir.1989), we held that an employer's decision to terminate a plan does not give rise to any fiduciary duty to disclose the impending termination to employees potentially affected by it. Admittedly, the plaintiffs in Payonk conceded in this court that the termination decision itself was not made in the employer's fiduciary capacity. See id. at 225 (Garth, J., announcing the judgment of the court). Nonetheless, the tone of our opinions made clear that we viewed this concession as compelled by settled law, not simply a point to be assumed arguendo. See, e.g., id. at 229 (stating that plaintiffs had "acknowledg[ed] that HMW was not acting in a fiduciary capacity with respect to plan participants when it made its termination decision"); id. at 231 (Stapleton, J., concurring in the judgment) ("Payonk acknowledges that HMW made its decision to terminate the plan in its capacity as the plan sponsor. Payonk thus concedes, as he must, that the defendants, in making that decision, owed no fiduciary duty to the plan or its participants."); id. at 234 (Mansmann, J., dissenting) ("[T]he decision to terminate is a business decision...." (emphasis in original)).[6]
 
 
 26
 For the reasons given, we think that Sutton and its progeny are sound, so we convert Payonk's assumption into an explicit holding--that an employer's decision to amend or terminate an employee benefit plan is unconstrained by the fiduciary duties that ERISA imposes on plan administration. Our conclusion does not imply that an employer has unfettered discretion to amend or terminate plans at will. In the case of pension plans, ERISA's detailed accrual and vesting provisions substantially limit this power. Moreover, employees and their unions remain free to bargain for vesting requirements in the terms of their plans above and beyond those required by statute. Finally, plaintiffs might be correct that an employer's purported amendment is invalid if the original plan's governing documents fail to reserve an amendment power expressly, or if employees are never notified of the amendment, or if an employer fails to follow certain formalities that ERISA mandates for effecting amendments, though we need not address these arguments in this Part.
 
 
 27
 If a purported amendment turns out to be invalid, then plaintiffs seeking anticipatory relief can have it declared void, and plaintiffs suing for benefits must have their claims evaluated under the terms of the relevant unamended plan. Count one, however, is a claim for breach of fiduciary duty, not just a claim "to recover benefits due ... under the terms of [a] plan." ERISA Sec. 502(a)(1)(B), 29 U.S.C. Sec. 1132(a)(1)(B). In deciding to amend the plan, Craven did not--indeed could not--have breached any fiduciary duties, because he simply was not acting as an ERISA fiduciary. Therefore, the district court did not err in granting summary judgment for defendants on count one.[7]
 
 III. THE CLAIM FOR BENEFITS
 
 28
 Plaintiffs' third cause of action seeks benefits under the terms of defendants' severance plan. See ERISA Sec. 502(a)(1)(B), 29 U.S.C. Sec. 1132(a)(1)(B).[8] The plan, however, was purportedly amended in 1987, before plaintiffs' termination, so as to make plaintiffs ineligible for any benefits above and beyond what they have already received. Thus, plaintiffs must establish two propositions in order to prevail: first, that the purported 1987 amendment had no legal effect as of the date they were discharged, and second, that they are entitled to benefits under the terms of the unamended 1985 plan.
 
 
 29
 A. Which Plan Controls?
 
 
 30
 We agree with the plaintiffs' contention that ERISA precludes oral amendments to employee benefit plans. Because defendants concede that the purported 1987 amendment was never reduced to a writing before plaintiffs were terminated, we conclude as a matter of law that the unamended 1985 plan must govern plaintiffs' claims for benefits.[9]
 
 
 31
 Section 402(a)(1) of ERISA requires that "[e]very employee benefit plan shall be established and maintained pursuant to a written instrument." 29 U.S.C. Sec. 1102(a)(1). Relying primarily on this provision, the Eleventh Circuit in Nachwalter v. Christie, 805 F.2d 956 (11th Cir.1986), held that "ERISA precludes oral modifications of employee benefit plans." Id. at 960. Since Nachwalter, at least five different circuits have agreed. See Pizlo v. Bethlehem Steel Corp., 884 F.2d 116, 120 (4th Cir.1989) (stating that "informal" or "unauthorized" modification of pension plans is "impermissible" under ERISA); Degan v. Ford Motor Co., 869 F.2d 889, 895 (5th Cir.1989) ("ERISA mandates that [a] plan itself and any changes made to it [are] to be in writing."); Musto v. American General Corp., 861 F.2d 897, 910 (6th Cir.1988) ("[A] written employee benefit plan may not be modified or superceded by oral undertakings on the part of the employer."), cert. denied, --- U.S. ----, 109 S.Ct. 1745, 104 L.Ed.2d 182 (1989); Moore v. Metropolitan Life Insurance Co., 856 F.2d 488, 492 (2d Cir.1988) ("[A]n ERISA welfare plan is not subject to amendment as a result of informal communications between the employer and plan beneficiaries."); Straub v. Western Union Telegraph Co., 851 F.2d 1262, 1265 (10th Cir.1988) ("[N]o liability exists under ERISA for purported oral modifications of the terms of an employee benefit plan.").
 
 
 32
 Each of these cases rebuffed an attempt to hold an employer to some sort of oral promise to increase benefits from those provided in formal written plans. As a textual matter, however, section 402(a)(1) draws no distinction between oral promises to increase benefits and oral decrees, like Craven's, that benefits be decreased. Indeed, to the extent that ERISA is primarily concerned with "promot[ing] the interests of employees and their beneficiaries," Shaw v. Delta Air Lines, Inc., 463 U.S. 85, 90, 103 S.Ct. 2890, 2896, 77 L.Ed.2d 490 (1983), the argument for disallowing oral amendments, at least as a policy matter, is even more compelling when such amendments purport to decrease benefits. Section 402(a)(1) was designed to ensure that "every employee may, on examining the plan documents, determine exactly what his rights and obligations are under the plan." H.Rep. No. 1280, 93rd Cong., 2d Sess. 297, reprinted in 1974 U.S.Code Cong. & Admin. News 5038, 5077-78. Employees entitled to rely on the terms of a written benefit plan "should not have their benefits eroded by oral modifications to the ... plan." Cefalu v. B.F. Goodrich Co., 871 F.2d 1290, 1296 (5th Cir.1989). "Congress, in passing ERISA, did not intend that participants in employee benefit plans should be left to the uncertainties of oral communications in finding out precisely what rights they were given under their plan." Musto, 861 F.2d at 909-10.
 
 
 33
 Defendants, however, urge us to distinguish Nachwalter and its progeny on the ground that most of those cases involved pension plans as opposed to welfare plans, which ERISA regulates far less extensively. The text of section 402(a)(1) simply will not bear this limiting construction. When Congress wanted to exempt welfare plans from regulations it imposed on pension plans, it knew full well how to do so. See, e.g., ERISA Sec. 201(1), 29 U.S.C. Sec. 1051(1) (exempting welfare plans from ERISA's participation and vesting requirements); id. Sec. 301(a)(1), 29 U.S.C. Sec. 1081(a)(1) (exempting welfare plans from ERISA's funding requirements). Section 402(a)(1), by contrast, applies to "[e]very employee benefit plan," 29 U.S.C. Sec. 1102(a)(1) (emphasis added), not just to employee pension plans. Therefore, we agree with the Second Circuit that "an ERISA welfare plan is not subject to amendment as a result of informal communications between an employer and plan beneficiaries." Moore, 856 F.2d at 492 (emphasis added).
 
 
 34
 Because the record is undisputed that defendants failed to reduce their purported 1987 amendment to a writing before plaintiffs were terminated, we must evaluate the summary judgment motions on the assumption that the unamended 1985 severance plan was still in effect.
 
 B. The Terms of the 1985 Plan
 
 35
 We now consider whether there exists a genuine issue of material fact as to plaintiffs' entitlement to benefits under the unamended 1985 plan. Defendants contend that there exists no genuine dispute that (1) the plan extends benefits at most to employees terminated because of the operational consolidation of Erico-Jones and KSM, and (2) plaintiffs were terminated well after that consolidation had been completed, for reasons unrelated to it. Therefore, they conclude, the summary judgment in their favor must be affirmed. Because we reject the first of these propositions, we must disagree.
 
 
 36
 With a good deal of force, defendants argue that the 1985 plan, as a matter of law, extends at most to employees terminated before the merger of Erico-Jones and KSM was completed. The "plan" itself is suffused with references to the merger. The cover page is entitled "Severance Pay Erico Jones-KSM Merger." It states that the severance policy is to be used "for the merger of Erico Jones and KSM," that the policy "cancels out any other severance policy for the time frame involved in adjustment of workload and responsibilities that is involved in this merger," and that a letter "drawn up by attorneys representing Erico and KSM, for the merger" must be handed out to covered employees.
 
 
 37
 Pointing out that the formal merger of Erico-Jones and KSM did not occur until over four months after they had been terminated, plaintiffs respond that a plan developed "for the merger of Erico Jones and KSM" can reasonably be construed as providing benefits at least until those two companies have been formally merged, not just operationally consolidated. We believe that the reference in the 1985 plan to "the time frame involved in adjustment of workload and responsibilities" cuts against plaintiffs' proposed construction. Moreover, we note that defendants introduced direct and unqualified testimony that the policy as originally conceived extended only to employees fired as a result of the operational consolidation. Craven, who was on the committee that drafted the package, testified that it was developed "specifically" for the "merger," a term defined as "the consolidation of [the] two operations, App. 277, and that the plan "applied only to people who were affected by this merger," App. 287. Annmarie Horan, KSM's personnel manager at the time in question, corroborated Craven's account. She testified that the plan was intended to apply to employees terminated "only as a result of the consolidation." App. 387.
 
 
 38
 Plaintiffs introduced no direct evidence to the contrary. Although plaintiffs cannot survive summary judgment simply by asserting that the factfinder might disbelieve the testimony of defendants' witnesses on this potentially dispositive issue, see Liberty Lobby, 477 U.S. at 256-57, 106 S.Ct. at 2514, nothing in Rule 56 prevents them from creating a genuine issue of material fact by pointing to sufficiently powerful countervailing circumstantial evidence. See, e.g., Williams v. Borough of West Chester, 891 F.2d 458, 460-61 (3d Cir.1989) (Becker, J., announcing the judgment of the court). Here plaintiffs point to two types of evidence: first, the memo written by Horan in 1986, and second, several examples in which severance benefits consistent with the terms of the 1985 plan were awarded to employees laid off after the consolidation had been completed. Plaintiffs contend that this evidence is sufficient to create a genuine issue of material fact as to the scope of entitlements defendants intended to create, and did create, in promulgating the original plan.[10] We agree.
 
 
 39
 On August 29, 1986, Horan circulated a memo on EFS stationery to a select group of that company's executives. The memo included a copy of the same benefits schedule circulated over a year earlier in Claflin's 1985 memo. The cover page of Horan's memo was entitled "Severance Pay Guidelines." It refers to the benefits schedule as "EFS' severance pay guidelines."
 
 
 40
 We believe that this memo at least suggests that the 1985 plan was intended to extend beyond employees terminated as a result of the consolidation. Horan herself testified that the consolidation of Erico-Jones and KSM occurred between July 1985 and September 1986. App. 387. A reasonable factfinder could conclude that as of August 29, 1986, the consolidation was almost complete and Horan knew it. On that date, however, Horan circulated a memo about the "severance pay guidelines" of EFS, the merged entity, which contemplated future application of those guidelines but which made no hint whatsoever of their impending termination. Under these circumstances, such an omission seems odd, especially from someone with "personal knowledge" of the scope of the plan from its inception, App. 387. The omission seems less odd, however, on the assumption that the 1985 plan was to continue in effect through the future foreseeable as of August 29, 1986--for example, at least until the formal merger, which occurred over 15 months after the Horan memo was written.
 
 
 41
 We do not mean to suggest that the Horan memo is conclusive evidence to that effect. Obviously, an August 29, 1986 memo contemplating the future provision of benefits is reconcilable with Horan's deposition testimony that the plan covered only a consolidation completed in--and therefore continuing into--September 1986. Also, Horan's failure to mention the plan's imminent termination might simply have resulted from the brevity that frequently characterizes inter-office memoranda, rather than Horan's implicit assumption that the plan's termination was not imminent. Nonetheless, we think that the memo lends at least some support to plaintiffs' proposed interpretation of the plan, an interpretation further supported by defendants' practices during the period in which Neff and Hartmann controlled Midwest.
 
 
 42
 The summary judgment record indicates that during this period, at least nine employees of Midwest received severance benefits consistent with the terms of the 1985 plan. Accepting defendants' contention that the consolidation had been completed before Midwest was sold to Neff, it follows that each of these employees was paid benefits even though none was terminated as a result of the consolidation. Moreover, the decision to grant benefits was made in each case by Hartmann, who had been a member of the original EIC committee that created the 1985 package. During this same period, Hartmann decided not to grant benefits to at least six other employees terminated by Midwest. Of these, however, three left the company voluntarily to begin other joint ventures with Neff and Hartmann, and a fourth was apparently granted a consulting agreement in lieu of severance.
 
 
 43
 We believe that this evidence could support a finding that Hartmann, a member of the committee that created the 1985 severance package, believed that it obliged him to grant benefits to employees terminated before the merger was legally effected, even though the operational consolidation had already been completed. A similar belief might be imputed to Richard Ripley, another Midwest executive formerly a member of the 1985 committee, on the basis of a letter Ripley wrote to Midwest's counsel on July 25, 1987. The letter states that "we need to know our position if we make further cuts but do not offer ... severance [pursuant to the 1985 package]," App. 123, which at least suggests that Ripley too had some doubts in his mind. Moreover, we believe that a reasonable factfinder could deemphasize defendants' extrinsic evidence, which consists of testimony of officials who either are or were employees of defendants themselves. Finally, in light of plaintiffs' evidence regarding the Horan memo and Hartmann's 1987 practices, we believe that a reasonable factfinder could construe a plan created "for the merger" as continuing in effect at least until the merger has been legally consummated, despite the narrower construction suggested at first glance by the original plan's reference to "the time frame involved in adjustment of workload and responsibilities that is involved in this merger."
 
 
 44
 We do not suggest, of course, that this is the correct, or even the most plausible, way to view the evidence in the summary judgment record. At this point, we are only concerned with whether a reasonable factfinder could synthesize all this evidence into a judgment for plaintiffs. Under the chain of reasoning outlined above, we conclude that it could, and that the district court therefore erred in granting summary judgment to defendants on plaintiffs' claim for benefits under the terms of the 1985 plan.[11]
 
 IV. REPORTING AND DISCLOSURE VIOLATIONS
 
 45
 Plaintiffs' second cause of action seeks a declaratory judgment that defendants' violations of ERISA's reporting and disclosure provisions, ERISA Secs. 101-111, 29 U.S.C. Secs. 1021-1031, are either relevant or dispositive in determining plaintiffs' entitlement to benefits. Much of the parties' argument on this score centers on whether defendants' purported amendment was rendered invalid by their failure to satisfy section 104(b)(1) of ERISA, which requires that any "material modification" in the terms of a plan be disclosed to each participant and beneficiary "not later than 210 days after the end of the plan year in which the change is adopted." See 29 U.S.C. Sec. 1024(b)(1). Because we have already determined that the purported amendment was invalid on other grounds, see supra Part III(A), we need not decide this issue. Plaintiffs contend further, however, that defendants' reporting and disclosure violations are also relevant in evaluating their entitlement to benefits under the terms of the unamended 1985 plan. Insofar as this latter contention affects what evidence the trier of fact may consider on remand, it remains a live issue in this case. We therefore address--and reject--only the latter contention.
 
 
 46
 ERISA contains two express causes of action to remedy reporting and disclosure violations as such. Section 502(a)(4), 29 U.S.C. Sec. 1132(a)(4), allows a participant to sue "for appropriate relief" in the case of violations of section 105(c) of ERISA, 29 U.S.C. Sec. 1025(c) (Supp. V 1987) (as amended), which requires disclosure of certain tax information to certain participants. In the case of all other reporting and disclosure violations, an aggrieved participant must sue under section 502(a)(1)(A) "for the relief provided in [section 502(c) ]." 29 U.S.C. Sec. 1132(a)(1)(A) (1982). Section 502(c), in turn, makes an administrator personally liable to the participant for no more than $100 per day, or for "such other relief as [the court] deems proper." 29 U.S.C.A. Sec. 1132(c)(1), -(3) (Supp.1990) (as amended). Moreover, with two limited exceptions not relevant here, liability under section 502(c) cannot be imposed unless and until a participant requests from the administrator the information to which he claims entitlement, and the administrator fails to comply with the request for at least 30 days. Id. Sec. 1132(c)(1)(B).[12] Plaintiffs do not allege claims under either section 502(a)(4) or section 502(a)(1)(A).
 
 
 47
 Plaintiffs contend, however, that defendants' reporting and disclosure violations are relevant in evaluating their claim under section 502(a)(1)(B) to recover benefits "due to [them] under the terms of [their] plan." 29 U.S.C. Sec. 1132(a)(1)(B) (1982). That, in essence, was the Ninth Circuit's holding in Blau v. Del Monte Corp., 748 F.2d 1348 (9th Cir.1984), cert. denied, 474 U.S. 865, 106 S.Ct. 183, 88 L.Ed.2d 152 (1985). Blau involved a claim under section 502(a)(1)(B) challenging an administrator's denial of benefits. Under then-applicable precedent, the administrator's decision would be upheld unless, essentially, it were shown to be arbitrary and capricious. See id. at 1352-53. Blau held that "a court must consider continuing [reporting and disclosure] violations in determining whether the decision to deny benefits was arbitrary and capricious." Id. at 1354.
 
 
 48
 The frequent usage of the term "arbitrary and capricious" in this context is perhaps unfortunate, for it tends to elide a critical distinction between the applicable substantive standard of liability and the applicable standard of judicial review. In ordinary parlance, it seems reasonable to posit that an administrator who repeatedly or intentionally violates ERISA's reporting and disclosure provisions is behaving arbitrarily and capriciously. ERISA, however, does not entitle a participant to benefits whenever the administrator behaves arbitrarily; rather, it entitles him to benefits whenever "the terms of his plan" so provide. See ERISA Sec. 502(a)(1)(B), 29 U.S.C. Sec. 1132(a)(1)(B). Properly understood, therefore, the phrase "arbitrary and capricious" in this context connotes a deferential standard of judicial review, not a substantive standard of liability. It requires simply that a district court, in reviewing an administrator's construction of "the terms of [a] plan" so as to deny benefits to the plaintiff, afford some degree of deference to that construction.
 
 
 49
 To the extent that Blau was simply attempting to avoid a perceived unfairness in affording only deferential review in this context, its holding is no longer necessary. After Blau was decided, the Supreme Court rejected the arbitrary and capricious standard of review, holding instead that in actions challenging an administrator's denial of benefits under section 502(a)(1)(B), the district court must construe the terms of a plan de novo, unless the plan itself expressly provides otherwise. See Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101, 109 S.Ct. 948, 956, 103 L.Ed.2d 80 (1989). Blau, however, can plausibly be read as holding that reporting and disclosure violations are relevant in evaluating a section 502(a)(1)(B) claim regardless of whether the district court construes the terms of the plan deferentially or de novo. Since plaintiffs have asked us to endorse the Blau theory post-Bruch, we assume that this the principle they would have us announce.
 
 
 50
 Blau reasoned loosely that "procedural" (i.e. reporting and disclosure) violations are relevant because "procedural violations may ... work a substantive harm." 748 F.2d at 1354. Perhaps by "substantive harm" Blau meant that reporting and disclosure violations could interfere with a court's ability to review a section 502(1)(1)(B) claim "under the terms of [a] plan." That would occur, for example, if a defendant never disclosed the terms of its plan then lost all copies of it before discovery, thus threatening to render a potentially meritorious claim for benefits unprovable. Here as in Blau itself, however, this kind of "substantive" injury is simply not present: the terms of the plan are before the court, to be construed under whatever standard of review is found appropriate.[13]
 
 
 51
 Of course an employee can be harmed by an employer's reporting and disclosure violations regardless of whether the violations threaten to prejudice a potentially meritorious claim for benefits. An employee who never receives information about gaps in the coverage of his benefits package, for example, is unable to make fully informed decisions about whether to purchase alternative insurance, or even to seek alternative employment. That kind of injury is "substantive" to the extent that "substantive" means something like "real" or "substantial."[14] It cannot, however, plausibly be deemed relevant to a court's construction of "the terms of [a] plan" where, as here, the plan defines the scope of the entitlements it creates without any reference to reporting and disclosure issues. The terms of this plan, for example, provide that an employee is entitled to benefits if terminated "for the merger." We think it clear that the determination of whether a particular employee was terminated "for the merger," whatever else that term might mean, does not depend on the extent to which the employee was made aware that he would receive certain severance benefits if terminated "for the merger."[15]
 
 
 52
 The injury produced by reporting and disclosure violations as such is remediable under ERISA, of course, just not remediable under section 502(a)(1)(B). As explained above, a participant aggrieved by any reporting and disclosure violation has an available, though limited, remedy under section 502(a)(1)(A). Blau, however, decreed that "the remedy to which [reporting and disclosure violations] entitle[ ] the victimized employees has often been less than satisfactory." 748 F.2d at 1353. In order to right this wrong, Blau created a class of cases in which, although a plaintiff is not entitled to benefits solely because of a court's construction of "the terms of his plan," and although the reporting and disclosure violations as such give rise to different remedies under different statutory provisions, the plaintiff recovers benefits nonetheless. In effect, Blau creates a kind of hybrid action designed to afford the section 502(a)(1)(B) remedy (recovery of benefits) to redress violations of rights (to certain information) made remediable under section 502(a)(1)(A)--an action outside the literal scope of each, but implied from the penumbras of both, the recognition of which obliterates the limitations expressly built into the section 502(a)(1)(A) remedy.
 
 
 53
 It is well settled that implied remedies are disfavored in the context of statutes that set out an expressly detailed remedial scheme. "The presumption that a remedy was deliberately omitted from a statute is strongest when Congress has enacted a comprehensive legislative scheme including an integrated system of procedures for enforcement." Northwest Airlines, Inc. v. Transport Workers, 451 U.S. 77, 97, 101 S.Ct. 1571, 1583-84, 67 L.Ed.2d 750 (1981). ERISA is a prime example of just such a statute. Thus, in Massachusetts Mutual Life Insurance Company v. Russell, 473 U.S. 134, 105 S.Ct. 3085, 87 L.Ed.2d 96 (1985), the Supreme Court refused to imply a cause of action for extracontractual damages from ERISA. In language that could easily be transposed into a dissent to Blau, the Court explained:
 
 
 54
 The six carefully integrated civil enforcement provisions found in Sec. 502(a) of the statute as finally enacted ... provide strong evidence that Congress did not intend to authorize other remedies that it simply forgot to incorporate expressly. The assumption of inadvertent omission is rendered especially suspect upon close consideration of ERISA's interlocking, interrelated, and interdependent remedial scheme, which is in turn part of a "comprehensive and reticulated statute."
 
 
 55
 Id. at 146, 105 S.Ct. at 3092 (emphasis in original; citation omitted). Following the Supreme Court's warnings, we should be "reluctant to tamper with an enforcement scheme crafted with such evident care as the one in ERISA." Id. at 147, 105 S.Ct. at 3093.
 
 
 56
 The Blau court correctly noted two salutary purposes behind ERISA's reporting and disclosure provisions--to ensure that "the individual participant knows exactly where he stands with respect to the plan" and to "enable employees to police their plans." H. Rep. No. 533, 93rd Cong., 1st Sess. 11, reprinted in 1974 U.S.Code Cong. & Admin. News 4639, 4649; S.Rep. No. 127, 93rd Cong., 1st Sess. 27, reprinted in 1974 U.S.Code Cong. & Admin. News 4838, 4863. We believe that Blau 's rather freewheeling statutory construction, even though embarked upon to vindicate correctly perceived underlying purposes, has little place in the context of a carefully balanced and reticulated statute like ERISA. Congress did seek to provide employees with more information about their plans. However, Congress also chose to limit the remedies available for violations of the very provisions designed to effect that purpose.
 
 
 57
 Perhaps these limitations represent a modest concession to employers' interests. More likely, they embody Congress's judgment that employees themselves are best served by an enforcement regime that minimizes employers' expected liability for reporting and disclosure violations--and with it, the disincentives against creating employee benefit plans in the first place--consistent with ensuring that plan administrators have some significant incentive to make required disclosures to employees who want the information enough specifically to request it. "[T]he detailed provisions of Sec. 502(a) set forth a comprehensive civil enforcement scheme that represents a careful balancing of the need for prompt and fair claims settlement procedures against the public interest in encouraging the formation of employee benefit plans." Pilot Life Insurance Co. v. Dedeaux, 481 U.S. 41, 107 S.Ct. 1549, 1556, 95 L.Ed.2d 39 (1987).
 
 
 58
 It is perhaps arguable that Congress should have provided employees with more generous remedies under section 502(a)(1)(A) for reporting and disclosure violations. Through express textual provisions of ERISA, however, Congress has provided only limited remedies in this context.[16] Absent constitutional objection, of course, it is not the job of this court to second-guess Congress's judgment in these matters. "Our task is to apply the text, not to improve upon it." Pavelic & LeFlore v. Marvel Entertainment Group, --- U.S. ----, 110 S.Ct. 456, 460, 107 L.Ed.2d 438 (1989).
 
 
 59
 For the foregoing reasons, we hold that defendants' reporting and disclosure violations are irrelevant in determining plaintiffs' entitlement to benefits under the terms of the 1985 plan. To the extent plaintiffs seek benefits under section 502(a)(1)(B), they must do so on the basis of "the terms of [their] plan," which defines the scope of the entitlements it creates without reference to the extent of the disclosure of its terms. To the extent plaintiffs seek redress for defendants' reporting and disclosure violations as such, they should have sought the remedies available to them under section 502(a)(1)(A). We decline to use section 502(a)(1)(B) as a device to undercut the limitations built into section 502(a)(1)(A), and we decline to follow Blau accordingly.
 
 
 60
 In sum, to the extent that count two of the complaint seeks to have the purported 1987 amendment struck down because of defendants' failure to satisfy the notice requirement of section 104(b)(1) of ERISA, see supra p. 1167, this contention has been mooted by our determination that the amendment is invalid on other grounds. To the extent that count two seeks to establish that defendants' reporting and disclosure violations are relevant in determining plaintiffs' entitlement to benefits under the terms of the 1985 plan, that contention is without merit. Accordingly, we will affirm the district court's grant of summary judgment for defendants on count two of plaintiffs' complaint.
 
 V. CONCLUSION
 
 61
 We conclude that the district court's grant of summary judgment for defendants is appropriate on each of the first two counts of the plaintiffs' complaint. We conclude that the claim for benefits must be evaluated under the terms of the unamended 1985 severance plan, and that under those terms there exists a genuine issue of material fact as to plaintiff's entitlement. Therefore, we conclude that the district court's grant of summary judgment on count three was inappropriate. Accordingly, we will affirm in part, reverse in part, and remand for further proceedings consistent with this opinion.
 
 
 
 *
 Honorable Robert F. Kelly, United States District Judge for the Eastern District of Pennsylvania, sitting by designation
 
 
 [1]
 In the district court, defendants argued that the 1985 severance package did not constitute a "welfare plan" as that term is defined in Sec. 3(1) of ERISA, 29 U.S.C. Sec. 1002(1) (1982). The district court concluded otherwise, and defendants no longer contest this issue
 
 
 [2]
 Every ERISA plan must have an administrator. Because the documents establishing the plan at issue here failed to name any administrator, defendants, as the plan's sponsor, are deemed to be the administrator by operation of law. See ERISA Sec. 3(16)(A), 29 U.S.C. Sec. 1002(16)(A). Defendants readily concede that Craven, installed as Midwest's general manager by EIC, was given "full and complete authority" to run Midwest. Appellee's Br. at 6. Thus, Craven plainly had "discretionary authority" over the plan
 
 
 [3]
 Our prior cases have approached similar questions within a similar analytical framework. For example, in Hlinka v. Bethlehem Steel Corp., 863 F.2d 279 (3d Cir.1988), we distinguished between an employer's "administration" decisions, to which ERISA's fiduciary duties attach, and its "design" decisions, as to which it remains free to "act[ ] as an employer and not a fiduciary." See id. at 285. The question presented here--whether a decision to amend involves plan administration or plan design-arose in Trenton v. Scott Paper Co., 832 F.2d 806 (3d Cir.1987), cert. denied, 485 U.S. 1022, 108 S.Ct. 1576, 99 L.Ed.2d 891 (1988). That case, however, was decided on the alternative ground that the purported fiduciary had not been granted discretionary authority over the relevant amendment decision. See id. at 808-09
 
 
 [4]
 In part, section 404(a)(1) provides:
 [A] fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and--
 (A) for the exclusive purpose of:
 (i) providing benefits to participants and their beneficiaries; and
 (ii) defraying reasonable expenses of administering the plan;
 (B) with the care, skill, prudence and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims;
 (C) by diversifying the investments of the plan so as to minimize the risk of large losses, unless under the circumstances it is clearly prudent not to do so; and
 (D) in accordance with the documents and instruments governing the plan insofar as such documents and instruments are consistent with the provisions of [ERISA].
 
 
 [5]
 Admittedly, plaintiffs do not frame the issue in these terms. Rather, they attempt to characterize Craven's actions as violating fiduciary duties only insofar as they were allegedly inconsistent "with the documents and instruments governing the plan." ERISA Sec. 404(a)(1)(D), 29 U.S.C. Sec. 1104(a)(1)(D). But Craven's actions in amending the 1985 plan cannot be governed by the Sec. 404(a)(1)(D) fiduciary duty unless an amendment decision involves plan "administration" within the meaning of Sec. 3(21)(A)(iii) of ERISA, see supra p. 1159, in which case it must also be governed by the Sec. 404(a)(1)(A)(i) fiduciary duty. See supra note 4 and accompanying text. In short, we see no textual basis in either Sec. 3(21)(A) or Sec. 404(a)(1) of ERISA from which to suppose that some conduct constitutes "administration" for purposes of triggering the Sec. 404(a)(1)(D) fiduciary duty, but not the Sec. 404(a)(1)(A)(i) fiduciary duty
 
 
 [6]
 Delgrosso v. Spang & Co., 769 F.2d 928 (3d Cir.1985), cert. denied, 476 U.S. 1140, 106 S.Ct. 2246, 90 L.Ed.2d 692 (1986), relied on heavily by the plaintiffs, is not controlling. Delgrosso involved a purported amendment to a pension plan executed in violation of an express provision in the plan itself. Admittedly, Delgrosso at times characterized the employer's action in seeking to promulgate the amendment as a violation of its fiduciary duty to "administer the plan according to plan documents," id. at 935 (citing ERISA Sec. 404(a)(1)(D)), which presupposes that executing an amendment involves plan "administration" within the meaning of Sec. 3(21)(A)(iii). We do not read Delgrosso as so holding, however. Regardless of whether fiduciary duties do or do not attach to an employer's amendment decision, the particular amendment at issue in Delgrosso was invalid under the terms of the unamended plan's governing documents. Because ERISA grants participants the right to seek equitable relief from acts that violate the terms of their plan, see ERISA Sec. 502(a)(3), 29 U.S.C. Sec. 1132(a)(3) (quoted in Delgrosso, 769 F.2d at 937), that invalidity alone was sufficient for the Delgrosso plaintiffs to obtain the remedy they sought--reformation of the plan to strike the purported amendment--regardless of whether any fiduciary duty had been breached. Moreover, Sec. 502(a)(1)(B) of ERISA, 29 U.S.C. Sec. 1132(a)(1)(B), entitles a participant to bring an action "to clarify his rights to future benefits under the terms of the plan." Although not cited in Delgrosso, this provision, as well as Sec. 502(a)(3), would plainly support the remedy sought and obtained in Delgrosso regardless of whether any fiduciary duty had been breached
 
 
 [7]
 Even if plaintiffs could establish that a fiduciary duty owed to them has been breached, it is unclear whether they could recover from defendants in their fiduciary capacity. The liability of fiduciaries is governed by Sec. 409 of ERISA, which provides that "[a]ny person who is a fiduciary with respect to a plan who breaches any of the ... duties imposed upon fiduciaries by [ERISA] shall be personally liable to make good to such plan any losses to the plan resulting from each such breach." 29 U.S.C. Sec. 1109(a) (emphasis added). This liability accrues only to the plan itself, not to participants suing in their individual capacities. See Massachusetts Mutual Life Ins. Co. v. Russell, 473 U.S. 134, 140, 105 S.Ct. 3085, 3089, 87 L.Ed.2d 96 (1985). Section 502(a)(2) of ERISA entitles individual participants to sue "for appropriate relief" under Sec. 409. 29 U.S.C. Sec. 1132(a)(2). Because Sec. 409 liability accrues only to the plan itself, Sec. 502(a)(2) in effect allows individual participants to sue "in a representative capacity on behalf of the plan as a whole." Russell, 473 U.S. at 142 n. 9, 105 S.Ct. at 3090 n. 9. Because plaintiffs here seek to recover benefits allegedly owed to them in their individual capacities, their action is plainly not authorized by either Sec. 409 or Sec. 502(a)(2). However, because we conclude that defendants have not breached any fiduciary duties, we need not speculate as to the circumstances, if any, under which allowing individual participants to recover directly from a fiduciary can be justified under any of ERISA's other remedial provisions, an issue also reserved by the Supreme Court in Russell
 
 
 [8]
 Plaintiffs characterize count three of their complaint as a "[federal] common law contract claim under ERISA." Appellants' Br. at 48. Because count three is plainly an action "to recover benefits [allegedly] due to [plaintiffs] under the terms of [their] plan," ERISA Sec. 502(a)(1)(B), 29 U.S.C. Sec. 1132(a)(1)(B), it is somewhat misleading to characterize it as a federal common law claim. Federal statutes, where applicable, displace federal common law. Although ERISA authorizes courts to create federal common law to govern the details of a Sec. 502(a)(1)(B) action as to which the statute is silent, see, e.g., Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101, 109 S.Ct. 948, 953-54, 103 L.Ed.2d 80 (1989), the action itself still arises under Sec. 502(a)(1)(B)
 
 
 [9]
 In light of this conclusion, we need not address plaintiffs' alternative contention that the purported 1987 amendment is invalid because the original plan's governing documents failed to "provide a procedure for amending such plan," in violation of Sec. 402(b)(3) of ERISA, 29 U.S.C. Sec. 1102(b)(3). The suggestion that violation of this provision might, in some circumstances, limit an employer's amendment power was made in Flick v. Borg-Warner Corp., 892 F.2d 285, 290-91 & n. 9 (Becker, J., concurring in part and dissenting in part)
 
 
 [10]
 To some extent, plaintiffs might be suggesting that defendants' post-formation practices are significant not only because they shed light on the intended scope of the entitlements as originally created, but also because they could expand the scope of previously created entitlements under an estoppel theory. However, we agree with Nachwalter and its progeny that an employer's post-formation promises to increase benefits, whether explicit and oral or implicit through custom, cannot alter the scope of entitlements created by a plan that must, under governing law, be "established and maintained" pursuant to a written instrument, ERISA Sec. 402(a)(1), 29 U.S.C. Sec. 1102(a)(1). See supra Part III(A). Any argument to the contrary, such as the one recently made in Black v. TIC Investment Corp., 900 F.2d 112 (7th Cir.1990), depends on the presupposition that the availability of estoppel in ERISA cases "is not so much a question of statutory interpretation as a question of public policy," id. at 114, which we reject
 Nothing in this footnote is meant to suggest that estoppel is never available in ERISA cases. To the contrary, in Rosen v. Hotel & Restaurant Employees & Bartenders Union, 637 F.2d 592 (3d Cir.1981), we permitted a participant to estop a pension fund from denying benefits on the basis of a plan provision mandating that certain contributions to the plan be made by the employer, not the employee. When the employer fell behind on the requisite contributions, thus jeopardizing the employee's pension, the employee sought to make, and did make, the contributions himself. On those facts, we allowed the use of estoppel. As we noted, the case involved "more than mere assurances" by the trustee, who also "deposited [the employee's] monies into the Fund's account." Id. at 598. Thus, Rosen "can be classified as one of the 'extraordinary circumstances' as outlined in [prior ERISA cases limiting the use of estoppel to extraordinary circumstances]." Id.
 We find no such "extraordinary circumstances" colorably present in this record. The most plaintiffs could allege is that defendants' practice of paying benefits to certain employees after the consolidation had been completed constituted an implied representation to all other employees that such benefits would continue to be provided, the scope of the original plan notwithstanding. We conclude that in these circumstances, entertaining a judicially created estoppel claim cannot be reconciled with section 402(a)(1) of ERISA.
 
 
 [11]
 Plaintiffs contend that they are entitled to summary judgment on this claim. As our analysis has suggested, however, we think that there is sufficient evidence from which a reasonable trier of fact could find for defendants. Accordingly, we reject plaintiffs' contention
 
 
 [12]
 The exceptions involve an employer's violation of 29 U.S.C.A. Sec. 1021(d) (Supp.1990), an amendment to ERISA requiring employers to disclose their failure to meet one of ERISA's minimum funding requirements, and an administrator's violation of certain portions of 29 U.S.C.A. Sec. 1166 (Supp.1990), an amendment to ERISA providing additional disclosure requirements with respect to certain group health plans. For violations of these provisions only, a participant may recover under Sec. 502(c) without first having requested the relevant information and been denied it. See 29 U.S.C.A. Sec. 1132(c)(1)(A) (Supp.1990) (as amended) (administrator's violation of Sec. 1166); id. Sec. 1132(c)(3) (employer's violation of Sec. 1021(d))
 
 
 [13]
 Arguably, this kind of "substantive" harm, where present, would justify shifting onto the defendant the burden of proving that the plaintiffs are not entitled to benefits under the terms of the plan--a kind of "procedural" gloss on section 502(a)(1)(B) designed to undo the prejudice threatened by the "procedural" reporting and disclosure violations. See Flick v. Borg-Warner Corp., 892 F.2d 285, 292-94 & nn. 16-17 (Becker, J., concurring in part and dissenting in part). Whatever the merits of that proposal, it is plainly distinct from--and narrower than--the course adopted in Blau. See id. at 294 n. 17
 
 
 [14]
 Cf. Sibbach v. Wilson & Co., Inc., 312 U.S. 1, 61 S.Ct. 422, 85 L.Ed. 479 (1940) (rejecting a similar definition of "substance," as opposed to "procedure," for purposes of Rules Enabling Act analysis, see 28 U.S.C. Sec. 2072)
 
 
 [15]
 We do not decide the different question whether reporting and disclosure violations are relevant or dispositive in determining the validity of plan amendments. See supra p. 1167. Reporting and disclosure violations might wreak especially substantial harm in this context. Imagine, for example, the case of an employee whose life insurance coverage is terminated by a plan amendment, who fails to purchase any alternative insurance because he never receives advance notice of the amendment, and who later becomes uninsurable because of an adverse change in his health. One difficulty with striking down a plan amendment on the basis of reporting and disclosure violations, even in such compelling circumstances, is that the failure to report and disclose a proposed amendment does not ripen into a violation until "210 days after the end of the plan year in which the change is adopted." ERISA Sec. 104(b)(1), 29 U.S.C. Sec. 1024(b)(1) (emphases added). To the extent that this provision would prevent a court from striking down an amendment in these circumstances, we hope that Congress will address this problem expeditiously
 Section 10002 of the Consolidated Omnibus Budget Reconciliation Act of 1985 (COBRA), Pub.L. No. 99-272, tit. X, Sec. 10002, 100 Stat. 82, 227 (1986), protects against a similar harm occurring to employees who, upon losing their jobs, also suddenly lose their entitlement to medical care under their employer's welfare plan. COBRA adds a new section 601 to ERISA, which permits an employee in those circumstances to elect statutorily defined continuation coverage. See 29 U.S.C. Sec. 1161(a) (Supp. V 1987). Continuation coverage under COBRA is of no help to an employee surprised by an unannounced plan termination, however, for the coverage need not extend beyond the date on which the employer ceases to offer any group health plan to any employee. See 100 Stat. at 228 (creating ERISA Sec. 602(2)(B) (codified at 29 U.S.C. Sec. 1162(2)(B) (Supp. V 1987))).
 
 
 [16]
 We need not determine the exact range of permissible remedies under Sec. 502(a)(1)(A), which varies according to how one balances the obvious tension in Sec. 502(c) between the express $100 per day limitation and the immediately following qualifier providing for "such other relief as [the court] deems proper." Plaintiffs, who advance no claim under Sec. 502(a)(1)(A), do not contend that their action to recover benefits can be sustained under the "such other relief" clause in section 502(c)