F. Alton TYBOUT, Trustee of the Tybout, Redfearn & Pell 401(k) Plan, Plaintiff,

v.

KARR BARTH PENSION ADMINISTRATION, INC., a corporation of the State of Pennsylvania; and the Equitable Life Assurance Society of the United States, a corporation of the State of the State of New York, Defendants.

**Civ. A. No. 92–149 MMS.**

United States District Court, Delaware.

March 31, 1993.

F. Alton Tybout, David G. Culley, and Michael I. Silverman of Tybout, Redfearn & Pell, Wilmington, DE, for plaintiff F. Alton Tybout, Trustee.

Robert J. Katzenstein and Michele C. Got of Smith, Katzenstein & Furlow, Wilmington, DE, for defendant Karr Barth Pension Admin., Inc.

Mary E. Urann and Kathleen Furey McDonough of Potter Anderson & Corroon, Wilmington, DE, for defendant the Equitable Life Assur. Soc. of the U.S.

## *OPINION*

MURRAY M. SCHWARTZ, Senior District Judge.

Both defendants, Karr Barth Pension Administration, Inc., a Pennsylvania corporation (Karr Barth), and The Equitable Life Assurance Society of the United States, a New York corporation (Equitable), have filed motions to dismiss plaintiff F. Alton Tybout's amended complaint pursuant to Rule 12 of the Federal Rules of Civil Procedure. Docket Items (D.I.) 21, 22. Plaintiff, as trustee of two pension plans, and a resident of Delaware, alleges claims under both the Employee Retirement Income Security Act (ERISA), 29 U.S.C. § 1001 *et seq.* (1988), and Delaware law based upon the failure of certain assets to be transferred from one pension plan to another. D.I. 18 at ¶ 1. This Court has jurisdiction under 29 U.S.C. § 1132(e)(1) and 28 U.S.C. § 1331 for the ERISA claims and under 28 U.S.C. § 1332 for the state law claims.

Plaintiff's amended complaint alleges three counts against each defendant. D.I. 18 at ¶¶ 45–77. The allegations are parallel in nature and consist of one claim under ERISA against each defendant individually, Counts I and IV, one claim under ERISA against the defendants jointly and severally, Counts II and V, and one claim under state law for negligence and breach of contract against each defendant, Counts III and VI. Defendants have asserted that the amended complaint fails to state a cause of action under ERISA and that the state law claims have been pre-empted by ERISA.[1] For the rea-

---

1. Defendant Karr Barth has argued that plaintiff has failed to name the party for whom Equitable apparently substituted and with whom Karr Barth primarily dealt as an indispensable party under Rule 19(a) of the Federal Rules of Civil Procedure.

    Under Rule 19(a), a party should be joined if three requirements are met. First, complete relief cannot be accorded among those already parties without the absent party. Second, the absent party claims an interest in the action, and his absence may impede his ability to protect his interest. And third, the absence of such party may subject the persons already parties to the risk of incurring multiple and inconsistent judgments.

sons which follow, defendants' motions will be denied as to plaintiff's claims under ERISA and will be granted with respect to plaintiff's state law claims.

## I.

Plaintiff's amended complaint focuses upon the action taken, or not taken, by the defendants with respect to two pension plans, a tax-qualified defined contribution plan, "the 401(k) Plan". D.I. 18 at ¶ 3. These plans were established by the law firm of Tybout, Redfearn, Casarino & Pell or its successor, Tybout, Redfearn & Pell, (both of whom will be referred to as "Tybout, Redfearn") on behalf of whom plaintiff acts as trustee.

Prior to July 1, 1988, defendant Equitable recommended that Tybout, Redfearn terminate the Defined Benefits Plan, establish the 401(k) Plan with Equitable as investment manager, and permit the participants to transfer any benefits into the 401(k) Plan. D.I. 18 at ¶ 11. Completing the transition from one plan to another involved at least one intermediate step. The assets, remaining in the Defined Benefits Plan, were to be transferred into a Fixed Income Account under Equitable's control. Thus, the Defined Benefits Plan remained in existence but the funding vehicle was changed to a Fixed Income Account under Equitable's control. D.I. 39 at 48. The Defined Benefits Plan, with its assets in the Fixed Income Account, was to remain in existence only until such time as the assets were utilized to fund the 401(k) Plan. The nub of the dispute is the unexplained failure to transfer the assets from the Fixed Income Account to the 401(k)

Plan with consequent loss to the beneficiaries.

Equitable proposed that it manage the funds invested in the Defined Benefits Plan before and those funds which were to be transferred to the 401(k) Plan occurred. D.I. 18 at ¶ 12. Tybout, Redfearn agreed to adopt these proposals and Equitable prepared and delivered documents by which the proposals could be completed. D.I. 18 at ¶ 14.

The amended complaint only mentions two of the documents delivered by Equitable. These two documents by no means represent the entire framework of the pension plans at issue here. Instead, they appear to govern, in part, the relationship between the trustees and Equitable. The first document addresses the relationship between the trustee and Equitable with respect to the 401(k) Plan. The second document addresses their relationship with respect to the Defined Benefits Plan.[2]

The first document, the "Master Retirement Trust Participation Agreement Participant Direction" (the 401(k) agreement), establishes the 401(k) Plan, although without any funding.[3] The 401(k) agreement provides that where participants

have the right to direct the proportion of contributions to be invested in the Accounts, the trustees of the participating trust shall together with each transfer to Equitable of contributions for investment under the RIA Master Trust, direct the allocation of the investment of such contributions in the Accounts in accordance with Participants' directions. If the Plan provides that the Participants have the right

*Chadwick v. Arabian American Oil Co.*, 656 F.Supp. 857, 862 (D.Del.1987) (footnote omitted). Nothing in the plaintiff's complaint indicates that complete relief could not be granted absent another party, and Karr Barth has provided no reason complete relief could not be granted. Karr Barth's argument that the failure to join the additional party will impede Karr Barth's ability to defend itself adequately, D.I. 25 at 22, does not implicate Rule 19(a).

**2.** The contracts referred to were not originally contained in the amended complaint. As a general rule, matters outside the complaint are not considered on a motion to dismiss. *Murphy v. Inexco Oil Co.*, 611 F.2d 570, 573 (5th Cir.1980).

However, in this case, the parties agreed at oral argument that the Court should consider the contracts and affidavit provided by Equitable and plaintiff as though they had been incorporated in the complaint. D.I. 39 at 26.

**3.** Plaintiff and B. Wilson Redfearn, as co-trustees of the 401(k) Plan, executed the 401(k) Agreement in the name of, and on behalf of, the trust created under the 401(k) Plan on August 25, 1988. Equitable's authorized agent, Christina Costa, executed the document on September 21, 1988. ¶¶ 14–17. The complaint alleges the 401(k) agreement is an asset of the 401(k) Plan and the trust created under that Plan. ¶ 18.

to direct the transfer of amounts invested in an Account to another Account or Accounts, then upon any such direction in accordance with the Plan, the trustees of a Participating Trust shall direct such transfers between the Accounts in accordance with the Participants directions, and all such transfers between Accounts shall be effected subject to the applicable provisions of the RIA Master Trust.

D.I. 34 at Ex. A, ¶ 5.[4] Because the complaint alleges "participants in the [401(k) Plan] have the right to direct the proportion of contributions to their Plan accounts to be invested in the investment accounts available under the [401(k) Plan]", D.I. 18 at ¶ 25, the language of this provision applies to the decision making within the 401(k) Plan.

The second document, the "Master Retirement Trust Participation Agreement Trustee Direction" (the "Defined Benefits Plan" agreement), changes the funding vehicle of the Defined Benefits Plan by authorizing transfer of assets into a Fixed Income Account, established under the control of Equitable.[5] According to the complaint, the trustee of the Defined Benefits Plan, pursuant to the instructions and advice of Equitable, transferred to Equitable $1,294,476.68, which was the amount of benefits to be transferred at the election of Defined Benefits Plan participants. D.I. 18 at ¶ 27. This amount was to be held in the Fixed Income Account until it became "legally permissible and administratively practicable" to transfer the amount to the trust created under the 401(k) Plan and invest the amount according to the procedures outlined. D.I. 18 at ¶ 28.

The Defined Benefits Plan agreement itself indicates that those assets were to be transferred into a Fixed Income Account. Under the heading "Prior Contributions", paragraph five of the document reads:

The trustees of the Participating Trust hereby direct that all amounts held under the Participating Trust as of the date this participation Agreement is executed ... shall upon the initial transfer thereof for investment under the RIA Master Trust, be allocated to the Accounts in accordance with the following....

D.I. 34 at Ex. B, ¶ 5. Beneath this passage, it is indicated that 100% of the assets should be in the Fixed Income Account. An identical indication immediately follows under the heading "Future Contributions".[6]

While these provisions explain the different roles of these documents, they do not indicate how the two documents fit into the larger scheme of the plans. Both documents, for instance, contain an identical provision which incorporates the "Retirement Investment Account Master Retirement Trust" into whatever the terms of the participating trust may be. This "Master Trust" was established in 1979 and amended in 1984, pursuant to an agreement between Equitable and the United States Trust Company of New York. By executing these documents, the trustees agreed to amend their participating trust to provide:

Notwithstanding any other provision of this trust agreement the trustee(s) may cause the monies or funds of this trust to be commingled with the assets of other employee benefit trusts qualified under the applicable provisions of the Internal Revenue Code by causing such monies or funds to be invested as part of the RIA Master

4. According to the documents, the Retirement Investment Account (RIA) Master Retirement Trust (RIA Master Trust) is "adopted as a group trust to permit the assets of a trust established under a new or existing tax qualified employee retirement to be funded in the RIA Master Trust...." D.I. 34 at Ex. A, 2.

5. Plaintiff, as trustee of the Defined Benefits Plan, executed this document on June 12, 1989, in the name of, and on behalf of, the trust created under the Plan. ¶ 20. Ms. Costa, again acting as Equitable's authorized agent, executed this document the following day, June 13, 1989. ¶ 21. The complaint alleges that the Defined

Benefits Plan agreement is an asset of the Defined Benefits Plan and the trust created under that Plan. ¶ 22.

6. Both these instructions are subject to a note which reads,

The trustees agree that unless the written consent of Equitable is first obtained (1) they may not change the percentages selected above by an amendment or otherwise and (2) they may not change to a Participation Direction arrangement by an amendment to this Participation Agreement or otherwise.
D.I. 34 at Ex. B, ¶ 5.

Trust. The monies or funds so invested shall be subject to all the provisions of said RIA Master Trust and the agreement establishing said RIA Master Trust shall be deemed to be a part of this trust agreement as if expressly incorporated herein.

D.I. 34 at Ex. A, ¶ 9; Ex. B, ¶ 9.

The RIA Master Trust Agreement has not been included in the record. However, it is explained somewhat in the appendix which both of the documents contain. The appendix explains,

Under the RIA Master Trust, all amounts received will be allocated as directed among the four Investment Accounts under the Master Contract: the Fixed Income Account, the Common Stock Account, the Balanced Account, and the Aggressive Stock Account. The Master Contract also states Equitable's obligations with respect to contributions, distributions, Investment Accounts, loans, transfers among Investment Accounts, if applicable, fees, expenses, interest allocations, and provides a wide variety of annuity options for retiring participants.

D.I. 34 at Ex. A, 2; Ex. C, 2. The Master Contract, which defines certain obligations of Equitable, also has not been included in the record.

On the advice of Equitable, the trustees of the 401(k) Plan retained the services of defendant Karr Barth to assist in transferring the pertinent funds, to advise the trustees of the Plans concerning administration and management, and to provide certain administrative and management services. D.I. 18 at ¶¶ 30–31. Subsequent to being retained, Karr Barth provided advice and recommendations for transferring the funds, terminating the Defined Benefits Plan and hiring fiduciaries and advisors for the 401(k) Plan.

On February 18, 1990, the trustees, on the advice of Karr Barth, delivered to Karr Barth the individual elections of the 401(k) Plan participants which described the investments desired once the funds were transferred into the trust created under the 401(k) Plan. D.I. 18 at ¶ 33. Also on February 18, 1990, the plaintiff signed a letter written by Equitable on Tybout, Redfearn letterhead which authorized and directed Karr Barth

"immediately to take all steps necessary to complete" the transfer of funds. D.I. 18 at ¶ 34. The trustees caused the letter to be mailed to Karr Barth and Karr Barth allegedly received the letter on February 19, 1990. D.I. 18 at ¶¶ 35–36. For reasons which remain unclear, the transfer did not occur.

After February 18, 1990, the amended complaint alleges "Karr Barth, as a direct result of its own carelessness, inattention or conscious refusal to act" failed to complete the transaction and failed to advise the trustees of its failure to complete the transaction. D.I. 18 at ¶¶ 37–38. In addition, the complaint alleges "Equitable, as a direct result of its own carelessness, inattention or conscious refusal to act," failed to complete the transaction, failed to inquire of Karr Barth concerning the status of the transaction and failed to advise the trustees of the failure to complete the transaction. D.I. 18 at ¶¶ 41–43.

On February 21, 1992, the Trustees first had actual knowledge that the transaction had not been completed. D.I. 18 at ¶ 44. On March 18, 1992, plaintiff filed his original complaint in this Court. D.I. 1.

## II.

■■■ "[A] count of a complaint may be dismissed for failure to state a claim only if, when accepting all factual allegations as true and drawing all reasonable inferences from these facts, no relief would be granted under any set of facts that could be proved." *In Re Delmarva Sec. Litig.*, 794 F.Supp. 1293, 1298 (D.Del.1992) (applying Rule 12(b)(6)). In applying this standard, the burden to show the failure to state a claim rests with the moving party. *Johnsrud v. Carter*, 620 F.2d 29, 33 (3d Cir.1980).

## III.

Plaintiff has alleged that both defendants breached duties owed to plaintiff under ERISA when they failed to transfer the funds in question out of the Defined Benefits Plan into the 401(k) Plan. Under ERISA, plaintiff has asserted two theories of liability: first, each of the defendants were fiduciaries

to the old and/or the new Plans and breached a fiduciary duty; second, even if the defendants were not fiduciaries, ERISA may extend liability to nonfiduciaries.[7]

## A. Claims Under ERISA

Fiduciary liability under ERISA arises under 29 U.S.C. § 1109 (1988) which states, in part,

> Any person who is a fiduciary with respect to a plan who breaches any of the responsibilities, obligations, or duties imposed upon fiduciaries by this subchapter shall be personally liable to make good to such plan any losses to the plan resulting from each such breach.... [8]

In determining who is a fiduciary, ERISA allows for fiduciary status to be conferred by express designation. 29 U.S.C. § 1105(c)(1)(A). The statute also allows "for named fiduciaries to designate persons other than named fiduciaries to carry out fiduciary responsibilities (other than trustee responsibilities) under the plan." 29 U.S.C. § 1105(c)(1)(B). *See Confer v. Custom Engineering Co.*, 952 F.2d 34, 39 (3d Cir.1991) (Seitz, J., concurring) ("[A] corporate officer may assume fiduciary status, even absent a designation as a named fiduciary or trustee of the plan, by performing functions that fulfill the statutory definition of a 'fiduciary'.");[9] *Consolidated Beef Industries, Inc. v. New York Life Ins. Co.*, 949 F.2d 960, 964 (8th Cir.1991), *cert. denied,* —— U.S. ——, 112 S.Ct. 1670, 118 L.Ed.2d 390 (1992) ("[A] person's title does not necessarily determine if one is a fiduciary."). Plaintiff has not argued that either defendant to this action has been expressly designated as a fiduciary with respect to the transfer of assets from the Defined Benefits Plan to the 401(k)

Plan.[10] Instead plaintiff argues that the defendants have been designated to "carry out fiduciary responsibilities" and qualify as fiduciaries under a statutory definition.

■ Before considering whether defendants qualify as unnamed fiduciaries under the statutory definition, the Court must first address defendant Karr Barth's argument that it cannot be named a fiduciary because § 1105(c) of ERISA "precludes the trustee of an ERISA plan from delegating *any authority or discretion to manage or control plan assets to any person* other than an investment manager...." D.I. 30 at 2. The terms of 29 U.S.C. § 1105(c)(1)(B) do not prevent delegation of any authority, except to an investment manager, but only prevent delegation of "trustee responsibilities". The statute defines "trustee responsibility" as "any responsibility in the plan's trust instrument (if any) to manage or control the assets of the plan, other than a power under the trust instrument of a named fiduciary to appoint an investment manager...." 29 U.S.C. § 1105(c)(3). While the trust at issue here may bear out Karr Barth's argument as applied in this case, this Court does not currently have the trust agreements before it. For this reason, the Court cannot say as a matter of law that plaintiff could not delegate to Karr Barth the responsibilities alleged in the complaint.

Since the scope of that which may not be delegated is not clear, the Court turns to the plaintiff's argument that defendants were fiduciaries notwithstanding the lack of formal designation because the defendants performed functions which fulfilled one of the three statutory definitions of "fiduciary". The section of ERISA which describes those

---

7. Because the United States Supreme Court has granted certiorari on the issue of nonfiduciary liability under ERISA, this Court will not address this theory of liability. *Mertens v. Hewitt Associates*, 948 F.2d 607 (9th Cir.1991), *cert. granted,* —— U.S. ——, 113 S.Ct. 49, 121 L.Ed.2d 19 (1992).

8. The statute defines "person" as "an individual, partnership, joint venture, corporation, mutual company, joint-stock company, trust, estate, unincorporated organization, association or employee organization." 29 U.S.C. § 1002(9).

9. In a footnote, the opinion for the majority in *Confer* agreed with Judge Seitz's reading of the statute. *Confer*, 952 F.2d at 37 n. 3.

10. As will be discussed, Equitable is a named fiduciary under the 401(k) Plan, but is only a named fiduciary with respect to certain accounts in the 401(k) Plan which are not at issue here. D.I. 34 at Ex. A, 6.

functions which will qualify a person as a "fiduciary" states:

> [A] person is a fiduciary with respect to a plan to the extent (i) he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets, (ii) he renders investment advice for a fee or other compensation, direct or indirect, with respect to any moneys or other property of such plan, or has any authority or responsibility to do so, or (iii) he has any discretionary authority or discretionary responsibility in the administration of such plan.

29 U.S.C. § 1002(21)(A).

■ In the analysis used to determine fiduciary status under § 1002(21)(A), "[i]dentifying the source of the fiduciary duty is the first step in determining the obligation to discharge it." *Rosen v. Hotel and Restaurant Employees and Bartenders Union*, 637 F.2d 592, 599 (3d Cir.), *cert. denied*, 454 U.S. 898, 102 S.Ct. 398, 70 L.Ed.2d 213 (1981). However, merely establishing the source of the duty, and thus the defendant's fiduciary status, will not state a claim for breach of fiduciary duty against that defendant. To state a claim, plaintiff must allege that defendant had both fiduciary status and a fiduciary duty to act with respect to the facts as alleged in the complaint. *Hozier v. Midwest Fasteners, Inc.*, 908 F.2d 1155, 1158 (3d Cir. 1990) ("Fiduciary duties under ERISA attach not just to particular persons, but to particular persons performing particular functions."). *See also Chicago Board Options Exchange, Inc. v. Connecticut General Life Insurance Co.*, 713 F.2d 254, 259 (7th Cir. 1983) (Defendant with power to amend contract has fiduciary status for "actions taken in regard to amending the contract and does not impose fiduciary obligations . . . when taking other actions."). Because the plaintiff has asserted liability under all three of the possible statutory paths to fiduciary status, the Court will address potential liability under each of the three statutory definitions of fiduciary status.

### 1. Fiduciary Status Under 29 U.S.C. § 1002(21)(A)(i) & (iii)

The United States Court of Appeals for the Third Circuit has addressed the first and third subsections of ERISA's statutory definition of fiduciary together, explaining,

> In determining who is a fiduciary under ERISA, courts consider whether a party has exercised discretionary authority or control over a plan's management, assets, or administration. If a person's authority or control does not concern "management" or "plan assets", that person is not a fiduciary under 3(21)(A)(i). Similarly, if a person's discretionary authority does not concern "administration" of a plan, that person is not a fiduciary under section 3(21)(A)(iii).

*Confer*, 952 F.2d at 36 (citations omitted). *See also Painters of Philadelphia Dist. Council No. 21 Welfare Fund v. Price Waterhouse*, 879 F.2d 1146, 1149 (3d Cir.1989) (independent public accountant not found to be acting as a fiduciary under 29 U.S.C. § 1002(21)(A)(iii)); *Nieto v. Ecker*, 845 F.2d 868, 871 (9th Cir.1988) (finding an attorney not a fiduciary under 29 U.S.C. § 1002(21)(A)(i)); *F.H. Krear & Co. v. Nineteen Named Trustees*, 810 F.2d 1250, 1259–60 (2d Cir.1987) (not finding attorney not a fiduciary as a matter of law under the 29 U.S.C. § 1002(21)(A) generally, but affirming existence of jury question). With these considerations in mind, the Court will address defendants Equitable and Karr–Barth in turn.

### a. Defendant Equitable

In its briefs, Equitable concedes that "it acts as an investment manager with respect to certain assets of the 401(k) Plan, i.e., those assets invested in the common stock, balanced and aggressive stock accounts and that, with respect to those assets and in that limited capacity, the Equitable is a fiduciary of the 401(k) Plan." D.I. 35 at 18. Moreover, Equitable concedes "it does have authority over the management of the Fixed Income Account." D.I. 35 at 22. As explained, these admissions of fiduciary status and authority do not immediately lead to finding a fiduciary duty. The issue becomes whether either admission, considered in the

context of facts alleged in the complaint, lead to a finding that Equitable had a fiduciary duty to transfer the assets into the 401(k) Plan. *Hozier*, 908 F.2d at 1158. Such a duty could arise from either Equitable's relationship to the Defined Benefits Plan or its relationship to the 401(k) Plan.

### (1) Duty With Respect to Defined Benefits Plan

Equitable has conceded it has control over the Fixed Income Account. D.I. 35 at 22. If the account is an asset of the Defined Benefits Plan, Equitable would have "control respecting management or disposition" of an asset of the Defined Benefits Plan and would qualify as a fiduciary under 29 U.S.C. § 1002(21)(A)(i). Under this theory, because the complaint alleges Equitable "failed to take all the steps necessary to complete" the transaction, Equitable's failure to exercise the control it has conceded it maintained would amount to a failure to act "with the care, skill, prudence, and diligence under the circumstances then prevailing...." 29 U.S.C. § 1104(a)(1)(B).

■ Equitable, however, argues that the Fixed Income Account is not an asset of the Defined Benefits Plan because it is a "guaranteed benefit policy" which disqualifies it as an asset under the exception provided in 29 U.S.C. § 1101(b)(2).[11] The United States Court of Appeals for the Third Circuit has stated that this section "unambiguously provides that assets maintained in a 'guaranteed benefit policy' are not to be treated as plan assets...." *Mack Boring and Parts v. Meeker Sharkey Moffitt, Actuarial Consultants*, 930 F.2d 267, 270 (3d Cir.1991). For the reasons which follow, under the analysis used by the Court of Appeals in *Mack*, this Court finds that the Fixed Income Account was a "guaranteed benefit policy".

■ In determining whether any given account qualifies under the statutory exception for a "guaranteed benefit policy", the Appellate Court first noted the distinction in the statute between "separate accounts contracts" to which the exception does not apply and "general accounts contracts" to which the exception may apply. *Id.* at 272. "Separate Account" is defined by that statute as:

> an account established or maintained by an insurance company under which income, gains, and losses, whether or not realized, from assets allocated to such account, are, in accordance with the applicable contract, credited to or charged against such account without regard to other income, gains, or losses of the insurance company.

29 U.S.C. § 1002(17). Thus, if the insurance company maintains an account for a plan, the finances of which are independent of the insurance company's own "income, gains, or losses", a "separate account" has been established, and the exception would not apply. However, the exception may apply if the account is a general account and certain other requirements are met.

In determining that all the requirements had been met and that the exception did apply in *Mack* the Court of Appeals stated,

> Because the ... contract ... was a general account insurance contract which provided in its entirety for a guaranteed, fixed amount of benefits to be paid to plan participants upon their retirement, we therefore conclude that, at least on its face, the guaranteed benefit policy exception ... encompasses the contract.

*Mack*, 930 F.2d at 274–275. Much of the Appellate Court's analysis focused upon the guarantees offered by the insurer and the consequent transfer of risk to the insurance company itself. *Id.* at 272.

Such guarantees and risk shifting describe the Fixed Income Account as alleged in plaintiff's amended complaint. The complaint states that certain assets of the De-

---

11. The statute states:

In the case of a plan to which a guaranteed benefit policy is issued by an insurer, the assets of such plan shall be deemed to include such policy, but shall not, solely by reason of the issuance of such policy, be deemed to include any assets of such insurer.

29 U.S.C. § 1101(b)(2). The statute defines "guaranteed benefit policy" as "an insurance policy or contract to the extent that such policy or contract provides for benefits the amount of which is guaranteed by the insurer. Such term includes any surplus in a separate account, but excludes any other portion of a separate account." 29 U.S.C. § 1101(b)(2)(B).

fined Benefits Plan were "to be temporarily held in a low interest fixed income account established on behalf of the [Defined Benefits Plan] only until such time as it became legally permissible and administratively practicable" to transfer those assets. D.I. 18 at ¶ 28. In the appendix attached to the agreements incorporated in the complaint, the Fixed Income Account is defined as follows:

> This Account provides for a guarantee of principal and interest at the current guaranteed interest rate and is allocated to Equitable's General Account. Loans under a plan may be made from this account only. The amount in the Fixed Income Account at any time will be equal to the total payments made to the account, plus the interest earned, less any plan benefit payments, loans and expenses deducted from the Account.

D.I. 34 at Ex. C, 3.

This Fixed Income Account offers the sort of "guaranteed, fixed amount of benefits" which the Court of Appeals found was not a plan asset in *Mack*. *Mack*, 930 F.2d at 274. Furthermore, under this provision, the assets are allocated to Equitable's General Account. These attributes of the Fixed Income Account lead to the conclusion that Equitable had agreed to bear any risks. For this reason, the complaint describes a guaranteed benefit policy which ERISA exempts from qualifying as a plan asset. Equitable's motion to dismiss will be granted to the extent that the plaintiff attempted to allege a breach of fiduciary duty based on Equitable's relationship to the assets held in the Defined Benefits Plan.

A finding that the Fixed Income Account does not qualify as an asset under ERISA does not end the analysis. The elimination of qualifying assets only precludes a finding of fiduciary status under the portion of § 1002(21)(A)(i) which attributes fiduciary status to those who exercise "any authority or control respecting management or disposition of [plan] assets." The other statutory paths to fiduciary status do not refer to assets, but instead confer fiduciary status upon any person who exercises "discretionary authority or discretionary control respecting management of such plan" or "dis-

cretionary authority or discretionary responsibility in the administration of such plan." 29 U.S.C. § 1002(21)(A)(i), (iii). *See Delgrosso v. Spang and Co.*, 769 F.2d 928, 936 (3d Cir.1985), *cert. denied*, 476 U.S. 1140, 106 S.Ct. 2246, 90 L.Ed.2d 692 (1986) (defendant breached its fiduciary duty "by failing to administer the Plan in accordance with the governing documents"); *Eaton v. D'Amato*, 581 F.Supp. 743, 746 (D.D.C.1980) (duties set forth in agreement, as amplified by affidavits establish fiduciary status in regard to certain activities).

■ With respect to Equitable's discretionary authority or control of the management of the Defined Benefits Plan, reference must be to the pertinent contract language to see if Equitable had a fiduciary duty which it may have breached. The agreement establishing the Defined Benefits Plan itself states in paragraph eight, "the trustees of a Participating Trust shall transfer all amounts under the Plan to Equitable. The trustees of a participating trust shall designate any individual or individuals authorized to prepare checks for deposit or *request withdrawals* on their behalf." D.I. 34 at Ex. B, ¶ 8. Fairly read, this provision means Equitable was to receive assets under the Plan and it was from Equitable that withdrawals were to be requested. Moreover, there was no limitation on the size of withdrawals which could not occur without Equitable's consent. The need for Equitable's consent raises the inference that Equitable had discretionary authority or control over withdrawals from the ·Plan, whether those withdrawals were minute or the sort of withdrawal at issue here.

In addition, the appendix to the agreement states:

> The Master Contract ... states Equitable's obligations with respect to contributions, *distributions*, Investment Accounts, if applicable, loans, transfers among Investment Accounts, if applicable....

D.I. 34 at Ex. C, 2. While this provision does not indicate precisely what Equitable's obligations were with respect to distributions, it does indicate that Equitable had obligations with respect to any withdrawals made from the Fixed Income Account as part

of the Defined Benefits Plan. With these two provisions indicating that Equitable had some authority and certain undefined obligations with respect to withdrawals, the Court finds that the complaint alleges Equitable exercised discretionary control respecting management or administration of the Defined Benefits Plan.

The resulting fiduciary status must be considered in light of the complaint's allegations in order to determine if Equitable had a duty to transfer assets. According to the complaint, Equitable advised plaintiff to terminate the Defined Benefits Plan and start the 401(k) Plan. D.I. 18 at ¶ 11. Equitable participated in the transaction in which the assets should have withdrawn from the Defined Benefits Plan and transferred into the 401(k) Plan. D.I. 18 at ¶ 34. Finally, Equitable failed to take the steps necessary to complete the transaction. D.I. 18 at ¶ 41.

These allegations suffice to state a claim that Equitable was in a position to exercise its authority over withdrawals from the Fixed Income Account which the contracts indicate it had. Because the complaint alleges that it was the withdrawal and transfer of assets which Equitable failed to accomplish, the Court finds that the plaintiff has stated a claim for breach of fiduciary duty under ERISA.

**(2) Duty With Respect to the 401(k) Plan**

■ With respect to the 401(k) Plan, plaintiff argues that certain provisions of the contracts executed between the parties granted Equitable "discretionary authority or discretionary control respecting management of such plan or . . . authority or control respecting management of disposition of its assets. . . ." 29 U.S.C. § 1002(21)(A)(i). *See Delgrosso,* 769 F.2d at 936 (defendant breached its fiduciary duty "by failing to administer the Plan in accordance with the governing documents"); *Eaton v. D'Amato,* 581 F.Supp. at 746 (duties set forth in agreement, as amplified by affidavits establish fiduciary status in regard to certain activities).

The agreement which initiated the 401(k) Plan indicates Equitable's role. The appendix attached to the agreement, in reference to a "Master Contract", states:

The Master Contract also *states Equitable's obligations with respect to contributions,* distributions, Investment Accounts, loans, transfers among Investment Accounts, if applicable, fees, expenses, interest allocation. . . .

D.I. 34 at Ex. A, 2. This provision makes clear that Equitable had some obligations with respect to contributions to the 401(k) Plan, just as it had with respect to distributions under the Defined Benefits Plan. However, unlike the authority over withdrawals under the Defined Benefits Plan, nothing in the 401(k) agreement itself indicates Equitable had authority over collections with respect to the 401(k) Plan.

The allegations in the complaint also do not indicate Equitable had discretionary authority over the management of the 401(k) Plan. The amended complaint alleges that Equitable unquestionably had a role in deciding when to transfer the assets out of the Fixed Income Account and into the 401(k) Plan. The complaint states:

On or about June 13, 1989, the trustee of the TR & P Pension Plan, pursuant to the instructions and advice of The Equitable, transferred to The Equitable $1,294,476.68 which was the aggregate accrued benefits . . . of those TR & P Pension Plan participants who elected to transfer their accrued benefits . . . to the TR & P 401(k) Plan and Trust. . . .

The Equitable had actual knowledge that [the benefits were] to be temporarily held in a low interest fixed income account . . . only until such time as it became legally permissible and administratively practicable to transfer . . . and invest [the benefits]. . . .

The Equitable advised the Trustees concerning the necessary documentation and appropriate steps required to effect the [transaction]. . . .

On or before February 18, 1990, the Equitable prepared and delivered to the Trustees a draft letter [which] authorized and directed Karr Barth immediately to take all steps necessary to complete the [transaction].

D.I. 18 at ¶¶ 27–29, 34 (parenthetical omitted). Fairly read, the complaint alleges Eq-

uitable's involvement up to the point of drafting the letter for the trustee to Karr Barth directing the transfer of funds from the Defined Benefits Plan to the 401(k) Plan.

Because Equitable was on both sides of the transaction in the sense that funds were to be transferred from the Defined Benefits Plan and to the 401(k) Plan, it is a close question whether, as a fiduciary in some respects of the 401(k) Plan, Equitable should not be held to a heightened responsibility. The difficulty is there is conspicuously absent from the complaint any allegation that Equitable received instructions, or otherwise had authority, to collect the assets in its capacity as a fiduciary to the 401(k) Plan.[12] For this reason, plaintiff has failed to state a claim against Equitable for breach of fiduciary duty under ERISA with respect to the 401(k) Plan.

### b. Defendant Karr Barth

■ Defendant Karr Barth argues that the plaintiff has failed to state a claim under ERISA because Karr Barth exercised no control or authority, but instead performed only ministerial tasks. The United States Court of Appeals for the Third Circuit has stated, "Since discretionary authority, responsibility or control is a prerequisite to fiduciary status, it follows that persons who perform purely ministerial tasks, such as claims processing and calculation, cannot be fiduciaries because they do not have discretionary roles." *Confer*, 952 F.2d at 39. *Cf. Painters of Philadelphia Dist. Council No. 21 Welfare Fund v. Price Waterhouse*, 879 F.2d 1146, 1149 (3d Cir.1989) (independent public accountant performing tasks defined in 29 U.S.C. § 1023(a)(3)(A) not found to be acting as a fiduciary); *Nieto v. Ecker*, 845 F.2d 868, 870 (9th Cir.1988) (finding an attorney not a fiduciary "so long as he does not exercise any authority over the plan 'in a manner other than by usual professional functions'") (quoting *Yeseta v. Baima*, 837 F.2d 380, 385 (9th Cir.1988)). The issue with respect to defendant Karr Barth is whether

any inference arises from the complaint that Karr Barth had anything more than a ministerial role.

The complaint alleges that "The February 18, 1990 Letter authorized and directed Karr Barth immediately to take all steps necessary to complete" the transaction. D.I. 18 at ¶ 34. This allegation attributes to Karr Barth both the authority to complete the transaction and the discretion to take the necessary steps to complete the transaction. For this reason, Karr Barth's reliance on *Confer* is not persuasive for two reasons. First, the defendant at issue in *Confer* was the "plan supervisor" to whom the plan administrator had delegated certain duties. Karr Barth, on the other hand, is the plan administrator itself. Second, taking all steps essential to completion of the transfer of assets in this case is a task which goes beyond the type of tasks which the Appellate Court found to be ministerial in *Confer*, namely, plan drafting, handling claims and arranging insurance. *Confer*, 952 F.2d at 39.

Because it performed more than ministerial tasks, and because the complaint does allege that Karr Barth exercised "authority or control respecting management or disposition" of the 401(k) Plan's assets, Karr Barth qualifies as a fiduciary under 29 U.S.C. § 1002(21)(A). In light of the allegations that Karr Barth was directed and authorized by the trustee to complete the transaction, and the allegation that the transaction was not completed because of Karr Barth's alleged failure, the Court finds that plaintiff has stated a claim for breach of fiduciary duty under ERISA against Karr Barth.

### 2. Fiduciary Status Under 29 U.S.C. § 1002(21)(A)(ii)

■ The statute itself also establishes fiduciary status if a person "renders investment advice for a fee or other compensation, direct or indirect...." 29 U.S.C. § 1002(21)(A)(ii). Under this subsection of the statute, plaintiff argues that the advice

---

**12.** Although at first blush this conclusion may appear inconsistent with the previous finding of Equitable's fiduciary duty as to withdrawals from the Fixed Income Account in the Defined Benefits Plan, that duty concerned withdrawals. The

duty at issue with respect to the 401(k) Plan concerned collection and it is this duty for which the plaintiff has failed to attribute discretionary authority to Equitable.

rendered by Equitable on terminating and transferring the assets of the Defined Benefits Plan establishes fiduciary status. To refute this argument, Equitable relies upon Department of Labor regulations. Those regulations essentially restrict the term "investment advice" as used in the statute to instances in which the person "renders advice to the plan as to the value of securities or other property, or makes recommendations as to the advisability of investing in, purchasing, or selling securities or other property...." 29 C.F.R. § 2510.3-21(c)(i)(1992). Equitable correctly asserts the plaintiff's complaint does not allege that Equitable offered any such advice.

In paragraph thirteen of the amended complaint, plaintiff alleges that "Tybout, Redfearn agreed to adopt The Equitable's recommendations and proposals concerning ... the management and investment of the assets of the [Defined Benefits Plan and the 401(k) Plan] by the Equitable." D.I. 18 at ¶ 13. Similarly, as to defendant Karr Barth, the complaint only alleges that Karr Barth provided advice on completing the transfer, terminating the former plan and hiring other fiduciaries for the 401(k) Plan. However, there are no allegations that Equitable or Karr Barth actually did manage, invest or advise plaintiff on the "the advisability of investing in, purchasing, or selling securities or other property...." 29 C.F.R. § 2510.3-21(c)(i).

In short, the complaint alleges that Equitable and Karr Barth advised plaintiff on terminating the Defined Benefits Plan and on transferring assets to the 401(k) Plan. Advice on the transfer of assets between plans is not the same as advice on how to invest those assets once they are in a plan. For this reason, the Court finds that neither Equitable nor Karr Barth were fiduciaries to the Defined Benefits Plan or the 401(k) Plan on the basis of the advice they offered as alleged in the complaint.

### IV.

■ Counts II and IV of the amended complaint assert claims under ERISA for joint and several liability of Equitable and Karr Barth under 29 U.S.C. § 1105 which governs liability for breaches of co-fiduciaries. In pertinent part, the statute provides:

In addition to any liability which he may have under any other provision of this part, *a fiduciary with respect to a plan* shall be liable for a breach of fiduciary responsibility of *another fiduciary with respect to the same plan* in the following circumstances ...

29 U.S.C. § 1105(a). It has already been determined that the complaint states a cause of action against Equitable for breach of a fiduciary duty with respect to the Defined Benefits Plan and against Karr Barth for breach of a fiduciary duty with respect to the 401(k) Plan. Thus, while both Equitable and Karr Barth face potential liability as fiduciaries, they do so under different plans. It follows there cannot be co-fiduciary liability under 29 U.S.C. § 1105 which requires they be fiduciaries under the same plan.

### V.

■ Both defendants have argued that the plaintiff's state law claims are pre-empted by ERISA. As an initial matter, the Supreme Court has stated, "in any pre-emption analysis, ' "the purpose of Congress is the ultimate touchstone." ' " *Metropolitan Life Ins. Co. v. Massachusetts*, 471 U.S. 724, 747, 105 S.Ct. 2380, 2393, 85 L.Ed.2d 728 (1985) (quoting *Malone v. White Motor Corp.*, 435 U.S. 497, 504, 98 S.Ct. 1185, 1189, 55 L.Ed.2d 443 (1978) quoting *Retail Clerks v. Schermerhorn*, 375 U.S. 96, 103, 84 S.Ct. 219, 222, 11 L.Ed.2d 179 (1963)). As to the congressional purpose behind ERISA pre-emption specifically, the Supreme Court has explained:

It is thus clear that ERISA's pre-emption provision was prompted by recognition that employers establishing and maintaining employee benefit plans are faced with the task of coordinating complex administrative activities. A patchwork scheme of regulation would introduce considerable inefficiencies in benefit program operation, which might lead those employers with existing plans to reduce benefits, and those without such plans to refrain from adopting them. Pre-emption ensures that the administrative practices of a benefit plan

will be governed by only a single set of regulations.

*Fort Halifax Packing Co. v. Coyne,* 482 U.S. 1, 11, 107 S.Ct. 2211, 2217, 96 L.Ed.2d 1 (1987). *See also Ingersoll–Rand Co. v. McClendon,* 498 U.S. 133, 140, 111 S.Ct. 478, 484, 112 L.Ed.2d 474 (1990) (stating that Congress's goal with the pre-emption provision was "to minimize the administrative and financial burden of complying with conflicting directives among States or between States and the Federal Government").

■ ERISA itself reads, in part, "the provisions of this subchapter ... shall supersede any and all state laws insofar as they may now or hereafter relate to any employee benefit plan...." 29 U.S.C. § 1144(a). In keeping with the stated purpose of ERISA and pre-emption analysis, the Supreme Court has "repeatedly stated that a law 'relate[s] to' a covered employee benefit plan ... 'if it has a connection with or reference to such a plan.'" *District of Columbia v. Washington Trade Board,* —— U.S. ——, ——, 113 S.Ct. 580, 583, 121 L.Ed.2d 513 (1992) (quoting *Shaw v. Delta Air Lines, Inc.,* 463 U.S. 85, 97, 103 S.Ct. 2890, 2900, 77 L.Ed.2d 490 (1983)). The Court has taken this position to give "effect to the 'deliberately expansive' language chosen by Congress." *Id.* (quoting *Pilot Life Insurance Co. v. Dedeaux,* 481 U.S. 41, 46, 107 S.Ct. 1549, 1552, 95 L.Ed.2d 39 (1987)). The pre-emption is so expansive that a state law will be pre-empted "'even if the law is not specifically designed to affect such plans, or the effect is only indirect,' and even if the law is 'consistent with ERISA's substantive requirements'". *Id.* (quoting *Ingersoll–Rand Co. v. McClendon,* 498 U.S. at 139, 111 S.Ct. at 483, in the first instance and *Metropolitan Life Ins. Co. v. Massachusetts,* 471 U.S. at 739, 105 S.Ct. at 2388, in the second).[13]

As the Supreme Court pointed out in a footnote in *Washington Trade Board,* however, "Pre-emption does not occur ... if the state law has only a 'tenuous, remote, or peripheral' connection with covered plans, as is the case with many laws of general applicability." *Id.* at —— n. 1, 113 S.Ct. at 583 n. 1 (citation omitted). *See also Mackey v. Lanier Collection Agency & Service, Inc.,* 486 U.S. 825, 832, 108 S.Ct. 2182, 2186, 100 L.Ed.2d 836 (1988) (Georgia general garnishment statute not pre-empted); *Fort Halifax Packing Co. v. Coyne,* 482 U.S. at 19, 107 S.Ct. at 2221 (Maine statute requiring employers to pay a one time severance payment not pre-empted).

Minimal guidance has been provided as to the content of the terms "tenuous" or "remote". However, the Supreme Court has, by providing some content to the term "relate to" indicated what "tenuous" or "remote" does not mean. As mentioned above, the Supreme Court has explained, "a law 'relate[s] to' an employee benefit plan ... 'if it has a connection with or reference to such a plan.'" *District of Columbia v. Washington Trade Board,* —— U.S. at ——, 113 S.Ct. at 583 (quoting *Shaw v. Delta Airlines, Inc.,* 463 U.S. at 97, 103 S.Ct. at 2900). Courts of appeals have also applied such broad terms in deciding the pre-emption issue. *See, e.g., Howard v. Parisian, Inc.,* 807 F.2d 1560, 1564 (11th Cir.1987) ("[I]f a state law claim arises out of the administration of benefits under a plan, the claim is pre-empted."); *Scott v. Gulf Oil Corp.,* 754 F.2d 1499, 1505 (9th Cir.1985) (To determine pre-emption "we inquire as to whether the conduct challenged by each claim was part of the administration of an employee benefit plan.").

The Supreme Court's holdings in ERISA pre-emption cases point the way to resolution of the pre-emption issue in this case. In *Ingersoll–Rand v. McClendon,* 498 U.S. at 139, 111 S.Ct. at 483, the Supreme Court held a state law claim that an employer had terminated plaintiff to avoid paying benefits to employee's pension fund was pre-empted. More importantly, faced with a common law claim of "tortious breach of contract" against a plan for improperly processing a claim for benefits, the Court found, "There is no dispute that the common law causes of action asserted in [plaintiff's] complaint 'relate to'

---

**13.** If the state law does expressly refer to pension plans, pre-emption will occur. *See, e.g., FMC Corp. v. Holliday,* 498 U.S. 52, 58, 111 S.Ct. 403, 408, 112 L.Ed.2d 356 (1990) (ERISA pre-empts state legislative scheme which makes express reference to "'any program, group contract or other arrangement for payment of benefits'") (quoting 75 Pa.Cons.Stat. § 1720 (1987)).

an employee benefit plan and therefore fall under ERISA's express pre-emption clause." *Pilot Life Ins. Co.*, 481 U.S. at 47, 107 S.Ct. at 1552.

If a "tortious breach of contract" claim for improperly processing a claim for benefits is pre-empted, the contract and negligence claims based on a failure to transfer funds from one pension plan (the Defined Benefits Plan) to another (the 401(k) Plan) must also be held pre-empted. The causes of action are too alike for any other conclusion. Moreover, preventing plaintiff from asserting the state law claims will advance the congressional purpose by limiting the exposure of plan investment managers and administrators to state law claims, and subjecting them primarily to applicable federal law. For this reason, the Court finds that the common law breach of contract and negligence claims in this case are claims which "relate to" the employee benefit plans at issue here and are pre-empted.

### VI.

The Court has found that, as to Count I, Karr Barth has been alleged to have breached a fiduciary duty with respect to the 401(k) Plan, but no such breach has been alleged with respect to the Defined Benefits Plan. In Count IV, the Court has found that the complaint alleges Equitable breached a fiduciary duty with respect to the Defined Benefits Plan, but not with respect to the 401(k) Plan. The Court has also found that Counts II and V are defective insofar as they ground co-fiduciary liability upon 29 U.S.C. § 1105. Under this circumstance, the Court would ordinarily enter an order dismissing the non-actionable portions of Counts I and IV and Counts II and V in their entirety.

However, the Court directed that the issue of nonfiduciary liability under ERISA not be briefed or argued pending resolution of that issue by the Supreme Court in *Mertens v. Hewitt Associates*, 948 F.2d 607 (9th Cir. 1991), *cert. granted*, — U.S. —, 113 S.Ct. 49, 121 L.Ed.2d 19 (1992). Since it is unknown how that decision will impact those portions of Counts I, II, IV and V which would ordinarily be dismissed, they will not be dismissed at this time with leave granted

to defendants to move to reconsider the order to dismiss should the decision in *Mertens* require revision of the order. The order to be entered will dismiss Counts III and VI.