

1996 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

7-15-1996

# In Re: New Valley

Precedential or Non-Precedential:

Docket 95-5140

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_1996

Recommended Citation

"In Re: New Valley" (1996). *1996 Decisions.* Paper 100.
http://digitalcommons.law.villanova.edu/thirdcircuit_1996/100

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 1996 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT


No. 95-5140


IN RE: NEW VALLEY CORPORATION,

Debtor

SENIOR EXECUTIVE BENEFIT PLAN PARTICIPANTS;
RICHARD L. CALLAGHAN; ALEXANDER J. CHISHOLM;
W. LEE ELKINS; ROBERT M. FLANAGAN;
ROBERT F. GARBARINI; ARTHUR A. GARMAN;
WALTER GIRARDIN; DELMAR HARMON;
J. WILLIAM HARRINGTON; JOHN P. HUNT;
JOHN A. HOLLANSWORTH; GERALD P. KENT;
D. D. LLOYD; RUSSELL W. MC FALL;
JOHN W. R. POPE, JR.; HERBET SALTER,
Estate of; STEVE SMISZKO; PHILLIP SCHNEIDER;
BERNARD WEITZER

v.

NEW VALLEY CORPORATION

Senior Executive Benefit Plan Participants
and Walter E. Girardin, Alexander J.
Chisholm, S. E. Smiszko, John A. Hunt, Arthur
Garman, Gerald P. Kent, Delmar Harmon, Robert
R. Garbarini, Walter L. Elkins, Walter E.
Girardin, Philip Schneider, J. William
Harrington, John A. Hollansworth, Bernard
Weitzer, John W. R. Pope, Jr., Robert M.
Flanagan, Douglas D. Lloyd, H. E.
Salter/Barbara Orr Salter, Richard L.
Callaghan, and Russell W. McFall,

Appellants.


On Appeal from the United States District Court
for the District of New Jersey
(D.C. Civil Action No. 94-cv-02405)

Argued December 11, 1995

Before: BECKER, ROTH and LEWIS, Circuit Judges

(Opinion Filed July 15, 1996)

George J. Cotz, Esq. (Argued)
185 Arch Street
Box 396
Ramsey, New Jersey  07446

Donald W. Reeder, Esq.
Box 630
10 S. Franklin Turnpike
Ramsey, New Jersey  07446
            Attorneys for Appellants

Myron D. Rumeld, Esq. (Argued)
Deidre A. Grossman, Esq.
Proskauer Rose Goetz & Mendelsohn LLP
1585 Broadway
New York, New York  10036

Frank Vecchione, Esq.
Crummy, Del Deo, Dolan, Griffinger & Vecchione
Professional Corporation
One Riverfront Plaza
Newark, New Jersey  07102
            Attorneys for Appellee

OPINION OF THE COURT

ROTH, Circuit Judge:

Appellants, participants in two top hat pension plans, filed claims in bankruptcy court seeking benefits after their employer had been declared bankrupt and terminated the plans. The bankruptcy court dismissed their claims, relying on a clause in the plan documents that reserved the company's right to amend or terminate the plans "at any time for any reason."  The bankruptcy court found this language clear and unambiguous, and

it refused appellants' proffer of extrinsic evidence to show that the clauses did not represent the original understanding of the parties. The district court affirmed. We will reverse and remand.

We conclude that the record in this case, viewed in the light of the special nature of top hat plans, distinguishes this case from prior decisions in which we have held a clause reserving the right to terminate or amend unambiguous and controlling. See In re Unisys Corp. Retiree Medical Benefit "ERISA" Litig., 58 F.3d 896 (3d Cir. 1995); Hozier v. Midwest Fasteners, Inc., 908 F.2d 1155, 1163–64 (3d Cir. 1990). Therefore, we hold on the facts of this case that the bankruptcy court should have permitted the appellants to present extrinsic evidence in support of their allegations. We will remand to the district court with instructions to remand to the bankruptcy court to conduct the necessary evidentiary hearing.

I.

Appellants are former executives and highly paid personnel of Western Union Corporation ("Western Union") who participated in two top hat plans designed to provide deferred retirement income and other retirement benefits to a select group of employees. As discussed more fully below, top hat plans represent a special category of benefit plans created under ERISA to provide these types of benefits to select employees. After the employees had retired, Western Union's successor, New Valley Corporation ("New Valley"), terminated the plans. Appellants responded with this action for benefits. The facts are essentially undisputed.

In the mid-1970s, the first rumblings of technological revolution were felt in the communications industry. Western Union had suffered financial reverses in the early part of the decade, and its Board of Directors ("Board") perceived a need to attract new executives to the company and to retain the key executives that it had. The Board viewed an enhanced benefits and compensation package as the principal means to that end.

In early 1977, the Board began discussing a supplemental benefits package entitled the Senior Executive Benefit Plan ("SEBP" or "SEB Plan"). The SEB Plan would provide a select group of high-level employees with supplemental pension benefits, deferred compensation benefits, and supplemental medical benefits. The plan was designed to achieve the previously identified goal of retaining Western Union's top management personnel and luring talented candidates to the company.

The initial draft of the plan was prepared by Gerald Kent, then Vice President–Employee Relations, in a form that substantially resembled the "SEBP Plan Summary" later distributed to the executives selected to participate. This document described the plan benefits in some detail but made no mention of any reservation of the company's unilateral right to amend or terminate the plan. Based on this summary, the Board approved the plan on August 23, 1977. The Board's minutes similarly omitted any mention of a right to amend.

After the Board's action, Western Union distributed

copies of the Plan Summary to potential participants.  As noted, the Plan Summary contained nothing indicating that Western Union reserved the right to amend or terminate the plan.  Western Union also held meetings with the participants to discuss the plan.  Appellants allege that at these meetings they were informed that they would earn the promised benefits by continuing their employment with Western Union until retirement and that the benefits could not be taken away after retirement.  Throughout the initial stages of plan proposal, development, adoption, negotiation, and acceptance, no reservation of the right to amend or terminate existed.

Western Union's General Counsel, Richard C. Hostetler, drafted the formal plan.  The formal plan document, introduced five months later at a board meeting on February 28, 1978, included an article which reserved the right to amend or terminate the plan at any time.  The text of this article, Article 12, reads:

> 12.  Amendment and Termination.  The Board of Directors may amend or terminate the Plan at any time for any reason and thereafter Participants and their estates and dependents shall have only such rights under the Plan, if any, as shall be specifically provided for by the Board of Directors under the Plan as amended or terminated.

All subsequent versions of the plan contained this provision.  However, none of the versions of the plan contained an integration clause.

Appellants are prepared to offer Mr. Hostetler's testimony that Article 12 was included in the SEBP formal document as "boiler plate" language that had been contained in all of Western Union's employee benefit plan documents.  Mr. Hostetler would also testify that at the Board meeting where Article 12 was discussed, the general understanding was that the provision could not be used to change or terminate benefits after retirement.  Appellants further allege that during a series of meetings held to discuss particular provisions in the Plan which might be of concern, Mr. Kent told them Article 12 could not be used to change or terminate their benefits after retirement.  Appellants likewise contend that this understanding was conveyed to executives recruited by the company.  Accordingly, although the plans as adopted contained the termination "at any time" language, the appellant's understanding of that provision was informed by these representations.

In 1979, a separate plan was created for Walter E. Girardin ("Girardin Plan").  The motivation for the Girardin Plan was much the same as for the SEBP, to retain a key executive.  At the time, Western Union faced a potentially difficult transition from its long-standing Chairman and CEO, Russell McFall, to his successor, Robert M. Flanagan.  Girardin, who had worked for Western Union for more than 40 years, had been passed over for the CEO position.  When Girardin announced his decision to retire, the Board decided that he should be kept on for at least a year so that his skill and experience could help in the

transition. Western Union offered Girardin an enhanced benefits package to induce him to remain with the company. After some negotiating, Girardin accepted. Although the Girardin Plan was adopted separately and at a date later than the SEB Plan, its substantive provisions were identical. It ultimately met the same fate as the SEBP. Both plans will be discussed together.

After appellants had retired, New Valley terminated the plans, relying on Article 12 for its authority. Appellants believe that, under the original agreement underlying the plan documents, such action was impermissible. Appellants therefore contend that New Valley breached the SEBP and Girardin contracts. Alternatively, appellants urge that New Valley be estopped from terminating their benefits because of the promises Western Union made to the plan participants. Appellants allege a variety of damages from the breach of contract, framed alternatively as detrimental reliance on Western Union's promise. Their claims include leaving secure employment with other companies to join Western Union, declining employment offers from other companies to remain at Western Union, uprooting families and moving to New Jersey to become eligible for the SEBP, taking early retirement based on plan benefits, and declining to pursue other retirement options because of the plan.

The procedural history of this case began in the bankruptcy court. At the time New Valley terminated the plans, its creditors had placed it in Chapter 11 bankruptcy. Appellants therefore responded to the denial of benefits by filing proofs of claims in the bankruptcy proceeding, rather than by following the traditional course of a suit in district court for benefits under 29 U.S.C. 1132(a). In pursuing their claims, appellants argued that Article 12 had to be considered in the context in which it was created and that, when taken in that context, it was ambiguous. They asked for a hearing in which they could support their claims with extrinsic evidence, including the testimony of Mr. Hostetler.

The bankruptcy court disallowed appellants' claims, relying principally on Article 12 of the plans. The bankruptcy court described appellants' proposed construction of Article 12 as plainly at variance with the terms in the plans. In re New Valley Corp., Ch. 11 Case No. 91-27704, Oral Decision with respect to Omnibus Objection No. 5 at 7 (Bankr. D.N.J. Apr. 8, 1994) (hereinafter "Bankruptcy Court Opinion"). The court held that the plans had been validly terminated pursuant to Article 12. Id.

The district court affirmed the bankruptcy court's decision, holding that the exemption of top hat plans from ERISA's writing requirement would not permit a departure from the plain meaning of Article 12, that Article 12 could not reasonably be interpreted to mean the plans vested at retirement, and that the bankruptcy court properly refused to hold an evidentiary hearing on the intent of the parties. Senior Executive Benefit Plan Participants v. New Valley Corp. (In re New Valley Corp.), Adv. No. 94-2405, slip op. at 19-20 (D.N.J. January 18, 1995) (hereinafter "District Court Opinion"). This appeal followed.

II.

The bankruptcy court heard this action pursuant to 28 U.S.C. 157. The district court had subject matter jurisdiction over the initial appeal under 28 U.S.C. 158(a). This court has jurisdiction over the appeal from the district court pursuant to 28 U.S.C. 158(d). We exercise plenary review over the district court's determinations and over the bankruptcy court's conclusions of law. We review the bankruptcy court's findings of fact for clear error. Fellheimer, Eichen & Braverman v. Charter Technologies, Inc., 57 F.3d 1215, 1223 (3d Cir. 1995).

III.

The principal issue before us is not whether the appellants can recover as a matter of law, but rather whether they can present evidence to establish that they bargained for a contractual set of benefits instead of a pension terminable at New Valley's whim any time after their retirement. We hold that appellants should have the opportunity to clarify the meaning of their benefits contract through a proffer of extrinsic evidence. Their claims will then succeed or fail based on the evidence presented to the fact finder.

A.

As a threshold matter, we have little difficulty concluding that ERISA provides the framework for our analysis. ERISA's coverage extends broadly to include all employee benefit plans. See Barrowclough v. Kidder, Peabody & Co., 752 F.2d 923, 929 (3d Cir. 1985). The SEB and Girardin Plans are clearly ERISA plans. See 29 U.S.C. 1002(3) (defining "employee benefit plan"); Miller v. Eichleay Engineers, Inc., 886 F.2d 30, 33 n.7 (3d Cir. 1989).

Finding ERISA applicable, however, is only an initial step. The far more important determination is to locate the SEB and Girardin Plans within ERISA's landscape. Both plans at issue are top hat plans, a fact that has crucial implications for this case. "A top hat plan is a 'plan which is unfunded and is maintained by an employer primarily for the purpose of providing deferred compensation for a select group of management or highly trained employees.' 29 U.S.C. 1051(2), 1081(a)(3), and 1101(a)(1)." Miller, 886 F.2d at 34 n.8; see also 29 U.S.C. 1002(36), 1003(b). The elements of this definition make the top hat category a narrow one. Not only must the plan be unfunded and exhibit the required purpose, it must also cover a "select group" of employees. This final limitation has both quantitative and qualitative restrictions. In number, the plan must cover relatively few employees. In character, the plan must cover only high level employees. Because of these limitations, top hat plans form a rare sub-species of ERISA plans, and Congress created a special regime to cover them.

The dominant characteristic of the special top hat regime is the near-complete exemption of top hat plans from ERISA's substantive requirements. Section 1051(2) exempts top hat plans from ERISA's minimum participation standards, minimum vesting standards, and various other content requirements. Section 1081(a)(3) exempts top hat plans from ERISA's minimum funding requirements. Section 1101(a)(1) exempts top hat plans from ERISA's fiduciary responsibility provisions, including the

requirement of a written plan, the need to give control of plan funds to a trustee, the imposition of liability on fiduciaries, and limitations on transactions and investments.  Section 1051(2) exempts top hat plans from ERISA's reporting and disclosure requirements upon promulgation of the proper administrative regulations.  These regulations are in place.  29 C.F.R.  2520.104-23 (1995) (establishing minimal alternative reporting requirements for top hat plans); Pane v. RCA Corp., 868 F.2d 631, 637 (3d Cir. 1989); see generally Barrowclough, 752 F.2d at 930-31.  As a result, top hat plans are covered only by ERISA's enforcement provisions.  Kemmerer v. ICI Americas, Inc., 70 F.3d 281, 286-87 (3d Cir. 1995), cert. denied, ___ U.S. ___, 64 U.S.L.W. 3776, 64 U.S.L.W. 3778 (May 20, 1996); Barrowclough, 752 F.2d at 931, 935, 937.

Although all of these provisions are important in defining the top hat category, one specific exemption from this list has particular importance for the current dispute:  top hat plans are excluded from ERISA's writing requirement.  Other ERISA plans, by contrast, are governed by a stringent writing requirement:  "Every employee benefit plan shall be established and maintained pursuant to a written instrument."  29 U.S.C. 1102(a)(1).  This provision has formed the cornerstone of a series of decisions by this and other courts limiting litigants to the language of the plan document.  See Hozier v. Midwest Fasteners, Inc., 908 F.2d 1155, 1163-64 (3d Cir. 1990) (citing cases).  Under this interpretation,  1102(a)(1) essentially operates as a strong integration clause, statutorily inserted in every plan document covered by the fiduciary duty provisions.  Like any common law integration clause,  1102(a)(1) makes the plan document the entire agreement of the parties and bars the introduction of parol evidence to vary or contradict the written terms.  See Mellon Bank, N.A. v. Aetna Business Credit, Inc., 619 F.2d 1001, 1010 n.9 (3d Cir. 1980) (discussing integration clauses and parol evidence rule).

Top hat plans are exempt from  1102(a)(1).  As a result, top hat agreements can be partially or exclusively oral.  They may, of course, be integrated by their own terms, just as they may contain any provision to which the parties agree.  They do not, however, gain the benefit of statutory additions such as  1102(a)(1).  Consequently, Hozier and other cases which limit employees strictly to the terms of the plan document are inapposite.  Top hat plans are instead governed by general principles of federal common law.  Barrowclough, 752 F.2d at 936.  Here, that law is the federal common law of contract.

Both parties agree that the plans in question are top hat plans.  Both the SEB Plan and the Girardin Plan therefore exist in the unique top hat category of ERISA coverage and exemption.  They are exempt from the writing requirement of 1102(a)(1), and federal common law developed under the aegis of ERISA governs their enforcement.

Applying the federal common law of contract, we believe that the bankruptcy court erred in construing the plan documents. A court cannot interpret words in a vacuum, but rather must carefully consider the parties' context and the other provisions

in the plan.  Moreover, extrinsic evidence should have been considered to determine whether an ambiguity existed, especially in the absence of an integration clause in the plan.

Whether a document is ambiguous presents a question of law properly resolved by this court.  Stendardo v. Federal Nat'l Mortgage Ass'n, 991 F.2d 1089, 1094 (3d Cir. 1993).  Our precedents clearly establish the steps involved in resolving a contractual ambiguity.

> To decide whether a contract is ambiguous, we do not simply determine whether, from our point of view, the language is clear. Rather, we "hear the proffer of the parties and determine if there [are] objective indicia that, from the linguistic reference point of the parties, the terms of the contract are susceptible of different meanings."  Sheet Metal Workers, 949 F.2d at 1284 (brackets in original) (quoting Mellon Bank, N.A. v. Aetna Business Credit, Inc., 619 F.2d 1001, 1011 (3d Cir.1980)).  Before making a finding concerning the existence or absence of ambiguity, we consider the contract language, the meanings suggested by counsel, and the extrinsic evidence offered in support of each interpretation.  Id.; Mack Trucks, 917 F.2d at 111; see alsoRestatement (Second) of Contracts   223 cmt.

> b (1981) ("There is no requirement that an agreement be ambiguous before evidence of a course of dealing can be shown . . ..").  Extrinsic evidence may include the structure of the contract, the bargaining history, and the conduct of the parties that reflects their understanding of the contract's meaning.

Teamsters Indus. Employees Welfare Fund v. Rolls-Royce Motor Cars, Inc., 989 F.2d 132, 135 (3d Cir. 1993).  And once a contract provision is found to be  ambiguous, extrinsic evidence must be considered to clarify its meaning.  See Hullett v. Towers, Perrin, Forster & Crosby, Inc., 38 F.3d 107, 111 (3d Cir. 1994); Taylor v. Continental Group Change in Control Severance Pay Plan, 933 F.2d 1227, 1234 (3d Cir. 1991).

Neither the bankruptcy court nor the district court followed these steps.  Both instead adopted, and then misapplied, a "four corners" approach to the contract.  Mellon Bank, 619 F.2d at 1011 ("Under a 'four corners' approach a judge sits in chambers and determines from his point of view whether the written words before him are ambiguous.").  Since Mellon Bank, however, this court has required the judge to hear the proffer of the parties and consider extrinsic evidence to determine whether there is an ambiguity, and then to resolve or clarify any ambiguity that may exist.

B.

Our interpretation of the SEB and Girardin top hat

plans is assisted by our recent decision in Kemmerer v. ICI Americas, Inc., 70 F.3d 281, 286-87 (3d Cir. 1995), cert. denied, ___ U.S. ___, 64 U.S.L.W. 3776, 64 U.S.L.W. 3778 (May 20, 1996). The unilateral contract theory in Kemmerer supports appellants' explication of the plans as a whole and of Article 12 in particular.

In Kemmerer, we interpreted a top hat plan that permitted plan participants to elect a payment schedule by which they would receive their benefits. The plaintiffs elected an extended payment schedule and later retired. The company then unilaterally terminated the plan, paying the remaining amounts due the participants in three annual installments. 70 F.3d at 285. The participants sued, the district court found a breach, and we affirmed.

After concluding that top hat plans were subject to ERISA, we turned to contract principles to resolve the dispute. Id. at 287. Examining the contract as a whole, we found a unilateral contract which created vested rights in those employees who accepted the offer it contained by continuing in the company's employment until retirement. Id. "Under unilateral contract principles, once the employee performs, the offer becomes irrevocable, the contract is completed, and the employer is required to comply with its side of the bargain." Id. In response to ICI's argument that the contract did not restrict its right to terminate the plan, we observed,

even when a plan reserves to the sponsor an
explicit right to terminate the plan,
acceptance by performance closes that door
under unilateral contract principles (unless
an explicit right to terminate or amend after
the participants performance is reserved).
"Any other interpretation . . . would make
the Plan's several specific and mandatory
provisions ineffective, rendering the
promises embodied therein completely
illusory."

Id. at 287-88 (emphasis added) (quoting Carr v. First Nationwide Bank, 816 F.Supp. 1476 (N.D. Cal. 1993)). In our view, the company's claim to an unfettered right to terminate in the face of specific grants of benefits "ha[d] no basis in contract law" and was "more than minimally unfair." Id. at 287.

Like the payout system set forth in Kemmerer, the post-retirement benefits of the New Valley plan can be construed as creating a unilateral contract offer that the employees accepted by working faithfully until retirement, at which time the benefits would vest. Thus, the plan may not be terminated unless an explicit right "to terminate . . . after the participant's performance is reserved." Kemmerer, 70 F.3d at 287-88.

In the current case, the plan documents do contain language that could be interpreted as reserving a right for New Valley to terminate even after retirement: the plan says it can be terminated "at any time." As a matter of plain language, New Valley contends, this phrase is unambiguous. But this is not necessarily so. A common example shows that the meaning of "at

any time" depends on the context.  Suppose an employer and employee enter into a contract stating that employee will work forty hours per week for $500, payable at the end of the week.  The contract further states that employment is at will and employer can change employee's wages "at any time."  After working a week, employee goes to pick up her pay check.  Employer informs employee that it has exercised its right to change her wages "at any time," and will be paying her $300 for that week's work.  Despite the seemingly unambiguous "at any time" language, it seems reasonable that an employee would not expect the reduction in salary to take place post-performance.  Although this is not our situation, it makes clear that the words "at any time" may admit of more than one reasonable interpretation.

The appropriate question, then, is whether "at any time" is unambiguous in this context.  The benefits at issue in this case, like the wages in our hypothetical case, are payable entirely after performance.  As in the wage scenario, agreeing to allow New Valley to terminate the benefits even after retirement would make this "contract" largely illusory.  Although parties are free to enter into illusory agreements, the unlikelihood that they will do so when significant benefits are at stake may render a term ambiguous.  In this context, the unlikelihood that the Appellants agreed to allow New Valley to terminate their retirement benefits at its whim, coupled with Appellants' reasonable alternative interpretation of "at any time" (until performance), supports the argument that the term is ambiguous.  If New Valley desired to clearly indicate its ability to terminate benefits even after performance, in the face of likely expectations to the contrary, it could have simply added the words "including after retirement" to the plan.

Moreover, in the current case, as in Kemmerer, other provisions in the plan point to a binding contractual agreement.  For example, the plan documents contain several "specific and mandatory provisions" promising what appear to be benefits which vest on retirement.  These provisions include Article 4, Deferred Compensation Benefit; Article 5, Supplemental Disability Benefit; and Article 6, Supplemental Medical Benefits.  The language quoted here is taken from the original 1977 plan.

Article 4 states:  "A deferred compensation benefit will be paid upon the death of any Participant after retirement on pension . . . ."  Article 5 states:  "Any Participant entitled to receive [basic benefits] whose Total Service at the date of disability exceeds five years, will receive . . . a supplemental disability benefit . . . ."  Article 6 states:  "(a)  Following termination of active employment on account of disability, a Participant may obtain supplemental medical benefits . . . .  (b) In the event of death . . ., the dependents of that Participant may obtain medical benefits . . . .  (c)  Dental benefits will be provided at no cost to [qualified participants]."  App. at 33-34 (emphasis added).  The mandatory language of these provisions denotes benefits that will be provided by the company once the participant retires, i.e., benefits that vest at retirement.

Other provisions provide less definite support for vested benefits.  Article 3 states the requirements for a

participant to receive a supplemental benefit.  These requirements include participation in the Basic Contributory Plan during employment, followed by retirement and receipt of a pension under the Basic plan.  Article 3 also states the method for calculating the supplemental pension.  This provision implies that a pension calculated in this manner will be given to those participants who satisfy these requirements.

Article 10, Suspension of Benefits, also provides indirect support for vesting at retirement.  This article makes no mention of post-retirement actions that could result in termination of benefits.  It discusses only "engag[ing] in any activity or conduct which, in the judgment of the Committee, is prejudicial to the best interests of the Corporation or its subsidiaries."  Id. at 34.  While this omission is not conclusive, it is consistent with a pension that vests on retirement.

"An ambiguous contract is one capable of being understood in more senses than one . . ..  Before it can be said that no ambiguity exists, it must be concluded that the questioned words or language are capable of [only] one interpretation."  American Flint Glass Workers Union, AFL-CIO v. Beaumont Glass Co., 62 F.3d 574, 581 (3d Cir. 1995) (quoting Landtect Corp. v. State Mut. Life Assur. Co., 605 F.2d 75, 80 (3d Cir. 1979)).  Based on the two interpretations offered by the parties, we cannot say that here.  By numerous indicia -- (1) that the words "at any time" are inconclusive; (2) that the right to terminate even after retirement would render the provisions for benefits largely illusory; and (3) that the plan contains numerous specific and mandatory provisions -- the contract language appears ambiguous.  These factors, coupled with the oral representations made by New Valley to the plaintiffs (that the plan did not permit termination after retirement) and the fact that we are dealing with an unintegrated top hat plan, convinces us that an ambiguity exists as to whether there was a right to terminate after retirement (or only before).  Our opinion is thus a narrow one, informed by this concatenation of factors.  Construing the plan document "as a whole," see Alexander v. Primerica Holdings, Inc., 967 F.2d 90, 93 (3d Cir. 1992), we find appellants understanding of Article 12 at least equally plausible as New Valley's interpretation.

Because appellants have demonstrated ambiguity in the plan, the bankruptcy court should have permitted appellants to present extrinsic evidence to clarify its meaning.  See Hullett v. Towers, Perrin, Forster & Crosby, Inc., 38 F.2d 107, 111 (3d Cir. 1994); Taylor v. Continental Group Change in Control Severance Pay Plan, 933 F.2d 1227, 1234 (3d Cir. 1991).  Evidence of the parties' intent, such as that proffered by appellants, is directly relevant to this issue.  Smith v. Hartford Ins. Group, 6. F.3d 131, 139 (3d Cir. 1993) ("[t]o choose between these competing meanings, we can consider extrinsic evidence of the parties' understanding of that term"); see also Taylor, 933 F.3d at 1233 (noting "the reasonable understanding of the beneficiaries, as well as the intent of the employer, may be admissible to clarify ambiguities [in an ERISA plan term]").

C.

The bankruptcy court should also consider appellants' promissory estoppel claims in light of their proffered extrinsic evidence. We have recognized the viability of estoppel claims against ERISA plans in general, see Rosen v. Hotel & Restaurant Employees and Bartenders Union, 637 F.2d 592, 598 (3d Cir.), cert. denied, 454 U.S. 898 (1981), and against top hat plans in particular, Pane v. RCA Corp., 868 F.2d at 630.

To establish a claim for equitable estoppel under ERISA, a plaintiff must prove: (1) a material representation, (2) reasonable and detrimental reliance upon the representation, and (3) extraordinary circumstances. Curcio v. John Hancock Mut. Life Ins. Co., 33 F.3d 226, 235 (3d Cir. 1994). In the context of this case, the first two elements are particularly germane. Because top hat plans can be partially or exclusively oral, top hat participants may reasonably rely on oral representations of benefits, even in the face of a termination clause like Article 12.

On remand, the bankruptcy court should address these issues. Analysis of appellants' estoppel claims will necessarily be affected by the interpretation given Article 12.

D.

In reaching these conclusions, we are well aware of our decision in In re Unisys Corp. Retiree Medical Benefit "ERISA" Litig., 58 F.3d 896 (3d Cir. 1995), which reached a different conclusion about the validity of a similar termination clause in the context of a different type of ERISA plan. We do not believe that Unisys can control the uniquely narrow category of top hat benefit plans on these different facts.

First, unlike the welfare benefits at issue in Unisys, top hat plans are exempt from ERISA's writing requirement, 29 U.S.C. 1102(a)(1). The rationale behind this distinction seems straight-forward. The potentially expansive size and scope of welfare benefit plans makes a writing requirement necessary as a practical matter of plan administration. Our decision in Unisys, for example, addressed a large scale employee welfare plan that provided a variety of benefits to approximately 21,000 employees at all levels. 58 F.3d at 899 n.4. Top hat plans, by contrast, cover narrow groups of select individuals. Because of the limited number of employees involved and their place in the organizational hierarchy, top hat plans can be exempted from the writing requirement without inviting administrative difficulties.

In terms of distinguishing Unisys, the exemption of top hat plans has importance beyond this practical rationale. As noted, supra, the writing requirement has formed the basis of a series of cases limiting employee-litigants to the language of plan documents. See Hozier v. Midwest Fasteners, Inc., 908 F.2d 1155, 1163-64 (3d Cir. 1990) (citing cases). The provision buttressed our decision in Unisys, where we noted that

> ERISA's framework ensures that employee
> benefit plans be governed by written
> documents and summary plan descriptions,
> which are the statutorily established means
> of informing participants and beneficiaries

> of the terms of their plan and its benefits.
> See, e.g., Hozier v. Midwest Fasteners, Inc.,
> [908 F.2d 1155, 1160 (3d Cir. 1990)], Confer
> v. Custom Engineering Co., 952 F.2d 41 (3d
> Cir. 1991), cert. denied, 503 U.S. 938
> (1992); Hamilton v. Air Jamaica, Ltd., 945
> F.2d 74 (3d Cir. 1991), cert. denied, 503
> U.S. 938 (1992); 29 U.S.C. 1022(a)(1).
> Accordingly, any retiree's right to lifetime
> medical benefits under a plan can only be
> found if it is established by the terms of
> the plan documents.

58 F.3d at 902. We later explained that under this provision, "the written terms of the plan documents control and cannot be modified or superseded by the employer's oral undertakings." Id. In the context of top hat plans, however, Unisys's statements are simply not true. The writing requirement does not apply. Unisysis not controlling.

Second, the exemption of top hat plans from ERISA's fiduciary provisions creates an important difference from Unisysin terms of the remedy available. Top hat employees have rights only under the contract. Where a contract action fails, they have no recourse. Welfare benefit plan participants, by contrast, enjoy an action for breach of fiduciary duty. We held in In re Unisys Corp. Retiree Medical Benefit "ERISA" Litig., 57 F.3d 1255 (3d Cir. 1995), cert. denied, ___ U.S. ___, 116 S.Ct. 1316 (1996), that welfare plan participants retained a cause of action for breach of fiduciary duty, despite the same general right to terminate or amend held fatal to the participants' contractual claim in the related Unisys case discussed here, 58 F.3d 896. Top hat participants have no such alternative remedy. They must seek their remedy in contract law. Contractual provisions must therefore be enforced with care.

Third, the very different nature of the benefits at issue in Unisys distinguishes that case from this. In Unisys, employees participated in an unfunded welfare benefit plan that promised ongoing medical benefits "for life." The benefits were payable as compensation while the employees worked and then continued on into retirement. After the participants retired, the company terminated the plan, relying on a general reservation of the right to modify or terminate "at any time" and "for any reason." The district court held the reservation of the right to terminate clear and unambiguous. It therefore rejected the participants' breach of contract and equitable estoppel claims and entered summary judgment for the employer. Id. at 898. We affirmed.

Although the language of the termination clause in Unisys was similar to the clause here, syntax is not determinative. This case involves benefits that are not payable, at all, until after retirement. In contrast to the benefits in Unisys, which were ongoing medical benefits available during working years and continuing into retirement, the benefits here became available only upon retirement. As we have noted, agreeing to terms allowing these benefits to be terminated even

after retirement would make the "agreement" illusory. Thus, because interpreting the words "at any time" to include "after retirement" seems less reasonable in this context, the words are more likely to be ambiguous in this case.

These distinctions (and the others noted above) show the important differences between the plans examined here and those examined in Unisys. In addition, we note that our decision in Unisys recognized its own limitations.

> We do not hold that a reservation of rights
> will always prevail over a promise of
> benefits. Due to the abundance of ERISA plan
> and the differing benefits these plans
> provide, each case must be considered fact
> specific and the court must make its
> determination of the benefits provided based
> on the language of the particular plan it has
> been called upon to review.

Id. at 904 n.11. We merely add to this general caution a caveat about the type of plan that the court must review. Here, in the context of a top hat plan, Unisys's holding does not apply.

## IV.

For the foregoing reasons, we will vacate the order of the district court and remand the matter with direction to vacate the order of the bankruptcy court and further remand to the bankruptcy court to hear appellants proffered evidence on the meaning of Article 12. We intimate no belief as to the ultimate meaning of Article 12, nor the eventual success of appellant's claims.